NILES v. CEDAR POINT CLUB.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1898.)

No. 541.

1. PUBLIC LANDS—SURVEY—MEANDER LINE.
   In an official survey of public lands, a meander line, run along the margin of marsh lands adjoining the waters of streams or lakes, will, if so intended, mark the boundary of lands described in subsequent patents by reference to the survey, and will not be regarded as a mere indication of the quantity of dry uplands paid for.

2. SAME—GRANTS OF LAND ON NAVIGABLE WATERS—HIGH-WATER MARK.
   Government grants for lands bordering upon navigable waters extend only to high-water mark, for the title to the shore and to the lands under such waters is in the state within which the waters are situated, as an incident of sovereignty.

3. SAME—MARSH LANDS—NAVIGABLE WATERS.
   Where marsh land bordering on navigable waters is subject only to temporary inundation in times of heavy gales, but at other times the water standing or flowing over or through it is the mere drainage from higher lands adjoining, it does not constitute a part of the navigable waters.

4. SAME—MEANDER LINE.
   An official survey, made in 1834-35, of government lands in Ohio, showed a meander line along marshy land extending to Lake Erie. No part of the marsh was surveyed at all. Patents granted to defendant's predecessor in title designated the boundaries of the land conveyed solely by reference to the official plats of the survey, and that was all that was paid for. Held, that the meander line was run as a boundary, and that the patentee and her successors in title were estopped to deny that the line of the marsh was a proper line for a boundary.

Appeal from the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

This bill was filed by the Cedar Point Club, an Ohio corporation, to restrain threatened continuous trespasses upon a large body of marshy land lying on the shore of Lake Erie and in Lucas county, Ohio.

The complainant's title depends upon patents from the United States to H. M. Hanna and Phillip La Corse, issued in 1882, and mesne conveyances to com-

plainant. ·Gertrude Jane Niles, the appellant, who was defendant below, denied the title of complainant, and claimed the same lands under 11 patents for fractional sections issued to Margaret Bailey in 1834, and under mesne conveyances to the said Gertrude J. Niles. Upon the pleadings and evidence there was a decree for the complainant, and a perpetual injunction awarded. The correctness of that decree depends upon the true boundary of the patents to Margaret Bailey. Those patents were for fractional parts of sections, and each was meandered on the southwestern margin of a marsh, having an area of some 4,900 acres, which lies between the meandered line of the Margaret Bailey patents and the open water of Lake Erie. If that meandered line, following the margin of the swamp, was intended as a boundary line, the decree must be affirmed, otherwise it must be reversed. The further facts necessary to be stated appear in a stipulation upon which the case was heard below, and are these:

(1) In 1834–35, Ambrose Rice, a government surveyor, surveyed and subdivided fractional township 9 S., in range 9 E., and townships 9 and 10 S., in range 10 E., from the Michigan meridian, and duly certified his field notes of such survey and subdivision to the then surveyor general, Robert T. Lytle. These townships are now in Lucas county, Ohio. In making a survey of these three townships, sections 22, 25, 26, and 27, township 9 S., range 9 E., and sections 30, 31, and 32, in township 9 S., range 10 E., and sections 4, 9, 10, and 11, township 10 S., range 10 E., were meandered on the southwestern margin of a marsh, described on one plat as "a flag marsh," and on another plat as "impassable marsh or water." On the west of this marsh, Rice at the same time surveyed a narrow strip of sand, separating this marsh from the open waters of Maumee Bay, and on the northeast a like strip, separating it from the open waters of Lake Erie. This strip commenced in section 22, township 9, range 9, and ended in section 11, township 10, range 10, and was divided by two openings into the lake, into what Rice called Cedar, Sandy, and Crane Islands. This strip was meandered on the one side along the open waters of the bay and lake, and on the other side on this same "flag marsh," or "impassable marsh or water." One of these plats, being that of subdivision of township 9 S., range 9 E., is set out on the opposite page, as exhibiting, in a general way, a portion of the meandered line of the fractional sections, the boundaries of which are here involved.

(2) On the 10th of July, 1844, 11 patents were issued to Margaret Bailey for these 11 fractional sections above mentioned,—that is, for sections 22, 25, 26, and 27, township 9, range 9, and sections 30, 31, 32, township 9, range 10, and sections 4, 9, 10, and 11, township 10, range 10,—extending the entire length of this marsh, each patent specifying the number of acres contained between the section line and the meandered line as run by Rice.·

(3) The plats and marginal field notes also show that the southerly edge of the "flag marsh," "impassable marsh and water," was surveyed, and that the lines of the fractional sections southerly of the said marsh and water were identical with the southerly edge of the marsh. The computed areas of the fractional sections and of their respective subdivisions, as shown upon the said plat, conformed to the area included within the said surveyed lines, and did not, nor any thereof, include any part of either marsh, water, or islands. The several patents to Margaret Bailey are of the same date, and each identical in form, except as to description. The description of the patent for section 11, township 10, range 10 E., is here set out as fairly typical of the form and description of all the rest. It is as follows: .

"To All to Whom These Presents shall Come—Greeting:

"Whereas, Margaret Bailey, of Champaigne county, Ohio, has deposited in the general land office of the United States a certificate of the register of the land office at Bucyrus, whereby it appears that full payment has been made by the said Margaret Bailey according to the provisions of the act of congress of the 24th of April, 1820, entitled 'An act making further provision for the sale of public land,' for fractional section eleven (11), in township ten (10) south of the Michigan base line, of range ten (10), in the district of land subject to sale at Bucyrus, Ohio, containing twenty (20) acres and forty-five hundredths of an acre, according to the official plat of the survey of said lands returned to the general land office by the surveyor general, which said tract has been purchased by the said Margaret Bailey."

(4) It appears, from the official correspondence of the land office in evidence, that in 1850 the state of Ohio, under the swamp act of that year, demanded pat-

TOWNSHIP Nº IX SOUTH RANGE Nº IX EAST OF THE MICH. MER.

ents for 32,438 acres as swamp land. Patents were issued for all these lands except 6,797 acres, the claim to which was rejected upon the ground that it was not swamp land, "and nearly all sold." Of the amount rejected, the greater part consisted of the lands marked "flag marsh," "impassable marsh and water," on the plats and in the field notes of Ambrose Rice, being the lands now here in controversy.

(5) On September 16, 1861, a patent was issued to Chester W. Norton for 34.89 acres, being the land known as "Cedar Point" on the plat of Ambrose Rice, east of Maumee Bay, in township 9 S., range 9 E. of the Michigan meridian. And on the 10th of October, 1876, a patent was issued to Arthur D. Howell for that portion of the sandy ridge shown on the plat of Ambrose Rice as Sandy Island and Crane Island, in section 24, township 9, range 9 E., and in sections 19, 29, 30, 32, and 33, in township 9 S., range 10 E., and in sections 2, 4, and 11, in township 10 S., range 10 E., Michigan meridian, and containing in all 55.55 acres, according to the official plat and survey of the said lands as returned to the surveyor general by said Ambrose Rice.

(6) On the 13th of July, 1874, the general land office issued a circular letter concerning the circumstances under which the department would cause surveys to be made of lands theretofore unsurveyed and platted because of the presence of water. Among other things stated in that circular letter, it was said: "The

beds of lakes (not navigable) sloughs, and ponds over which the lines of the public surveys were not extended at the date of the original survey, but which from the presence of water at the date of such survey were meandered, are held to be the property of the United States; and whenever, by evaporation or the operation of any other cause, natural or artificial, the waters of such lake, slough, or pond have so permanently receded or dried up as to leave within the unsurveyed area dry land, fit in ordinary seasons for agricultural purposes, such dry land is subject to survey and sale under the general laws regulating the disposal of the public domain."

In April and May, 1891, John B. Marston, a civil engineer residing in Lucas county, under the instructions from the commissioner of the general land office of date April 2, 1881, surveyed and subdivided into sections the area which was, as aforesaid, in and upon the surveyor general's plat of Ambrose Rice's survey designated as "flag marsh" and "impassable marsh and water," in said township 9 S., range 9 E., and townships 9 and 10 S., range 10 E., and on May 28, 1881, duly certified his field notes of said survey· to the then commissioner of the general land office. This survey was so made, and the area surveyed so subdivided into sections and parts of sections, as to complete and render full, to the extent that the area so then surveyed was in form suitable therefor, the sections which in said Rice's survey were rendered fractional by omission and exclusion from said survey of area designated as "flag marsh" and "impassable marsh and water." The boundary line on the westerly side of the area so surveyed by said Marston, from the point 2.75 chains easterly of the section line between sections 21 and 22, in township 9, range 9, extending somewhat east of north to the southerly extremity of the west part of Cedar Island, is the shore of Maumee Bay; and the boundary line on the southerly and westerly sides of said survey, from the point 2.75 chains easterly of the said line between sections 21 and 22, extending southerly and easterly to the outlet of Crane creek, in section 11, township 10, range 10, is identical with the boundary line between the surveyed lands and the "flag marsh" and "impassable marsh and water," as shown upon the said plat of the survey made by Ambrose Rice. The land thus surveyed and subdivided by Marston was subsequently patented to H. M. Hanna and Phillip La Corse, from whom the appellee holds deeds conveying all the rights of the said patentees thereunder. Concerning the character of the marshy land thus patented to Hanna and La Corse, the facts as stipulated by the parties in interest are these:

"(16) At the time of the making of the survey by Ambrose Rice, the waters of Lake Erie were above their ordinary stage, and there was more than the usual volume of water standing upon the land in controversy herein, and flowing to and upon the same from the large bodies of land, now in Ottawa, Wood, and Lucas counties, respectively, having their drainage to and through the said premises in controversy herein.

"(17) The general character, description, and condition of the said land surveyed by said Marston was by him correctly set forth, under the title 'General Description,' in the field notes of the said survey so as aforesaid by him certified to the commissioner of the general land office. That concerning the portion of said survey in township 9 S., range 9 E., reciting, to wit: 'The surface of that part of this fractional township comprised in this survey is covered with a deep marsh of grass, canes, or reeds, wild rice, etc. Many parts of it, particularly in the south and west part, are mown for a kind of coarse hay. Other parts are filled with bogs and pond holes that do not dry in summer. It receives the natural drainage from the woods on the south and west, which, without any well-defined channel, finds its way across the marsh to the lake. Again, in heavy gales of wind, it is subject to inundations from the lake, which, upon the subsidence of the gale, or change of direction in the wind, slowly finds its way out again into the lake. It is bounded along the lake by a sand beach averaging 1 chain in width and 3 feet in height.' That concerning the portion of said survey in township 9 S., range 10 E., reciting, to wit: 'The surface of this fractional township is covered with a deep marsh of grass, canes, or reeds, wild rice, etc. Much of the south part can be mown for marsh hay, being in a measure drained by a canal that has been constructed in the township south. Other parts are filled with bogs and pond holes that do not dry in summer. It receives the drainage from wood on the south and west, which spreads over the entire surface and, without any positive channel, finds its way to the lake. Again the township is

subject to inundations from the lake, during heavy gales of wind, which, upon the termination of the gale, or a change in the direction of the wind, slowly finds its way back into the lake. · This fractional township is bounded on the northeast by Lake Erie. Between the lake and the marsh proper is a sand beach, averaging 3 feet high and 1 chain in width, generally covered with bushes, and small trees of oak, poplar, willow and cottonwood.' That concerning the portion of said survey in township 10 S., range 10 E., reciting, to wit: 'The description for this township must necessarily be similar to that of the two preceding townships. The surface of that part of the township comprised in this survey is one large, swampy marsh, land generally very wet and boggy. Its surface is covered with grass canes (or joint grass), wild rice, and such like marsh productions, reaching to a height of 10 or more feet. Some parts, especially on sections 10 and 11, can be pastured, but the larger portion is filled with bogs and pond holes, connected by narrow and tortuous channels. It receives the drainage from the woods on the south and west, and is subject to inundations from the lake. On the prevalence of strong S. W. winds, this water flows from the marsh into the lake, and, upon the occurrence of N. E. winds, the lake floods the marsh. The principal outlets and inlets are Crane creek and Ward's canal. This canal is an improvement made by C. B. Ward, of Detroit, Michigan, on Sec. 4, and running across Sec. 5 for the purpose of getting vessels and ship timber from his ship yard on Sec. 5. It is built without locks, and is really only a great ditch. Waterway 50 feet. Depth 7 feet. The buildings (or sheds) at the fishing stations 4 and 11 are the only other improvements.' A comparison of the survey made by Ambrose Rice in 1834 and 1835 with that made by John B. Marston in 1881 indicates that Sandy and Crane Islands washed somewhat shoreward during the period intervening between the making of said respective surveys.

"(18) By reason of unusual drouth, which, during the years 1893, 1894, and 1895, prevailed quite generally over the region of country from which Lake Erie and its tributaries derive their waters, including that the drainage whereof was to and through the premises in controversy, the major portion of the said premises was dry during the summer of 1895, except in case of heavy local rains, or when the adjacent waters of Lake Erie were higher than they usually were during that summer."

Henry T. Niles and Frank C. Daugherty, for appellant.

Potter & Emery, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

By the provisions for the survey of public lands now found in sections 2395 and 2396, Rev. St., it is required that such lands shall be surveyed into townships six miles square, and each in turn subdivided into 36 sections of a mile square, except where the line of an Indian reservation, or of tracts of land heretofore surveyed or patented, or the course of navigable rivers, may render this impracticable; and in that case this rule must be departed from no further than such particular circumstances require. The patents to Margaret Bailey are for fractional sections. The boundary lines are not set out in the patents, but reference is made to the official plat of the survey of said lands for identification of the land granted, thereby adopting the plat as a part of the instrument. Hardin v. Jordan, 140 U. S. 371–380, 11 Sup.. Ct. 808, 838. When we refer to the plat and field notes, we find that all the lines of each fractional section are straight, except the line bordering the swamp or marsh, laid down upon one plat as "a flag marsh," and upon another as "impassable marsh and water." The straight

85 F.—4

lines of the sections are not continued into or across this marsh, but stop at the margin thereof. Beyond this marsh, and adjoining the open waters of Lake Erie, there was a long, low, and narrow sandy ridge, broken at points by shallow water channels. These small areas of dry land were separately conveyed and platted as additional fractional sections. Along the southwestern border or margin of this marsh, the plat shows that a line was meandered, and the question is, whether this line meandered along the water line of this marsh is the boundary line of the fractional sections bordered on said marsh. In view of the form of title granted to Margaret Bailey, we are called upon to inquire and determine the effect of that title in reference to this flag marsh, upon which her fractional sections meander. The long and undisputable practice of the government has been to measure the price of public lands, when patented, by the quantity of upland granted, and to require no payment for lands covered by the waters of streams or lakes. For the purpose of ascertaining the quantity of upland to be paid for, a line meandering the margin of such waters is run, and, where this is the purpose of running such a meandering line, it is not regarded as in any sense a boundary, but as only pointing out the sinuosities of the bank, for the purpose of arriving at the area of land to be paid for. Railroad Co. v. Schurmeir, 7 Wall. 272; Hardin v. Jordan, 140 U. S. 371–380, 11 Sup. Ct. 808, 838; Horne v. Smith, 159 U. S. 40–43, 15 Sup. Ct. 988.

As we understand it, the contention of the appellant is that this meander line, following the southerly water line of the marsh, was not run as a boundary line, and that, if the marsh, under the evidence, was a part of Lake Erie, her boundary is the shore line of the lake proper, and, if that shore line has receded, her boundary has followed the retreating shore, giving to her, under the doctrine of reliction, the land thus gained. On the other hand, her contention is that, if the marsh was not a part of the lake, but was a mere pond, marsh, or other shallow nonnavigable body of water, her boundary should be projected by extension of the side lines of each fractional section into said shallow pond or marsh, so as to complete each section as required by the law requiring the subdivision of each township into 36 sections of 640 acres each.

It has been long settled that government grants for lands bordering upon navigable waters extend only to high-water mark. The title to the shore, and to the lands under such water, is in the state within which such waters are situated, as an incident of the sovereignty of the state, and is held by the state in trust for the public purposes of navigation. The United States has never had title to submerged lands under navigable waters, and its grants could not, therefore, be held as conveying them to their patentees. Pollard v. Hagan, 3 How. 212; McCready v. Virginia, 94 U. S. 394; Webber v. Commissioners, 18 Wall. 57; Hardin v. Jordan, 140 U. S. 371–380, 11 Sup. Ct. 808, 838; Scranton v. Wheeler, 16 U. S. App. 152, 6 C. C. A. 585, and 57 Fed. 803. It would therefore follow that, if this "flag marsh," shown on the plats of Ambrose Rice, was then a part of Lake Erie proper, the submerged lands would not be subject to grant by the United States, and that the title of the Cedar Point Club would fail, and this without

regard to the goodness or badness of the title claimed under the doctrine of reliction by the appellant. But that marsh, under the stipulation as to the facts, cannot be regarded as a part of Lake Erie. The waters of that lake did not permanently submerge the lands described as "flag marsh," or "impassable marsh and water." In times of heavy gales the marsh was subject to temporary inundation, but otherwise the water, which stood or flowed over or through it, seems to have been the mere drainage from the higher lands adjoining, which found its way over these low lands to the lake. At the time of Rice's survey there was an unusual amount of water standing or flowing over the disputed land, and this may account for his failure to survey and plat it. When Marston made his survey, in 1881, much of the marsh was dry enough for pasture purposes, and much was capable of yielding harvests of coarse hay, and all, or nearly all, was covered with grass, wild rice, and other products of such swampy land. At a still later period it is shown that an even more favorable condition for pastoral purposes existed, due to unusual droughts occurring in 1893, 1894, and 1895. While, under the stipulation as to the facts, we must regard the condition of the marsh at the time of Rice's survey as exceptional, we have no such liberty in regard to its condition when Marston made his survey. We can, therefore, find no evidence of any such general and continuous lowering of the level of the water in the lake as would, by the doctrine of reliction, give to a riparian proprietor the land gained between an old and new shore line.

The decision of the supreme court of Ohio in James v. Howell, 41 Ohio St. 696, can have no effect as res judicata, because it was not a suit between the parties to this record. That was a controversy between James, a predecessor in title to the appellant, and Howell, the patentee of one of the so-called "sandy islands" shown on Rice's plat. James claimed then, as does his successor in title now, that the boundary of the Margaret Bailey patents was the open water of the lake, which would thus include Howell's island. Howell's defense seems to have been—First, that this marsh was a part of the lake proper, and that his patent was for an island separated from the shore of this lake by this marsh; second, that the meander line run by Rice on the border of this marsh was run as a boundary line, and therefore the grants to her could not, under any circumstances, convey land not within her boundaries. The case was decided for Howell upon both grounds. So far as it was a judgment upon facts, it is of no force or effect upon a different record and between different parties. The conclusion of that court upon the evidence relating to the character of this marsh was thus stated by the court:

"The contributions of such streams, mingled with other water of the lake, fill the straits between Cedar, Sandy, and Crane Islands, and the space platted as 'impassable water and marsh.' Even at low water in the lake, there is six inches of water in this marsh. Witnesses speak of a chain of ponds. These are merely spots in the marsh where, because of the depth, or for some other reason, vegetation has not been able to find support. The water is under the vegetation that covers the so-called marsh, as well as the so-called ponds. The islands are in fact surrounded by water, although vegetation of a certain sort grows thickly in much of that water. The meandered line along the southerly edge of the so-called marsh, was in fact along a shore of the lake. In order to form a statutory

boundary, the navigable river need not be actually navigable at every point. Lake Erie, as a whole, is navigable. For that reason, every part of its shore, under the act, might be treated by the surveyor as a legal boundary for fractional townships and sections. In so treating so much of the lake as lay behind these islands, Rice and Lytle did not exceed their authority. According to the evidence put in by James, as well as by Howell, it appears that, even at a low stage of the lake, there is six inches depth of water in this marsh, and a greater depth in the straits."

But the question as to whether this marsh was a part of Lake Erie, and therefore a proper boundary for public lands bordering thereon, is a question of fact, to be determined in this case upon the evidence in the record. There is no evidence in this record that the land in controversy "is land continuously submerged under not less than six inches of water in seasons when the water was lowest," such as was found in the Ohio case. No such state of facts is shown in this record, and by no stretch of imagination could any court, upon this record, conclude that this low, swampy body of land, partly boggy, partly dry, and sometimes subject to temporary inundation, was so continuously under the water of the great lake as to be a part thereof. We therefore reach the conclusion that this marsh was no part of Lake Erie when Rice made his survey in 1833–34, and that, if same was not included within the patents to Margaret Bailey for the fractional sections bordering thereon, it continued to be a part of the public lands, subject to survey and patent. That a water line existed along the course of the meandered line run by Rice cannot, perhaps, be collaterally questioned. But the question is whether that water line was the line of this marsh, then having an unusual amount of water collected therein, or the water line of the lake proper? That the meandered line followed the sinuosities of the marsh, and not of the lake, is most evident from the facts of this case. The area of the fractional sections is given, and it is stipulated that no part of the area of the marsh or sandy islands was included in the survey under which Margaret Bailey's patents issued. It is also evident that no part of the marsh was surveyed at all. It is thus most manifest that this meandered line was run as a boundary, and not merely for the purpose of ascertaining the quantity of dry land paid for. It would be useless to speculate as to the reason which induced Rice to make the border of this marsh a boundary of the fractional sections bordering thereon. That he did so there can be no doubt. Margaret Bailey paid only for the area of the lands actually included in the fractional sections, and accepted patents in which the meandered line along this marsh was made a boundary. She and her successors in the title are estopped to deny that the line of that marsh was a proper line for a boundary. The patents conveyed only the land which was surveyed.

The case is governed by that of Horne v. Smith, decided in 1894, and reported in 159 U. S. 40, 15 Sup. Ct. 988 et seq. That case involved the true boundary of three patents for fractional sections of public lands in Florida. The patents adopted the official plat of survey for identification of the lots granted. That plat showed that these lots were fractional sections bordering on Indian river. All the lines of the patents were the usual straight lines, with the exception of a line meandering a water line marked on the plat as "Indian

River." The facts as to this line, as stated in the opinion of the court, were these:

"Along the course of this meander line, as shown on the plat, runs, according to the testimony, a bayou or savannah, opening into the Indian river, and west of this bayou, and between it and the main waters of the river, is a body of land, extending a distance of a mile or a mile and a quarter, and amounting to some 600 acres. This is a body of low land, in some places, however, from four to six feet above the level of the river, and covered with a growth of live oak trees, many of them three and four feet in diameter. It was not land formed by accretion since the survey."

The contention was that this meandered line was not run as a boundary, but merely to ascertain the quantity of upland to be paid for, and that the patents granted the lands between that line and Indian river, which was, in fact, more than a mile away. The land lying between this meandered line and Indian river was not in fact surveyed. In the course of its opinion the court said:

"But the question in this case is whether the boundary of these lots is the bayou or the main body of the river. That a water line runs along the course of the meander line cannot, of course, in the face of the plat and survey, be questioned; but that the meander line of the plat is the water line of the bayou, rather than that of the main body of the river, is evident from these facts: In the first place, the area of the lots is given, and, when that area is stated to be 170 acres, it is obvious that no survey was intended of over 700 acres. In the second place, the meander line, as shown on the plat, is, so far as these lots are concerned, wholly within the east half of sections 23 and 26, while the water line of the main body of the river is a mile or a mile and a quarter west thereof, in sections 22 and 27. Again, the distance from the east line of the section to the meander line is given, which is less than a quarter of a mile, while the distance from such east line to the main body of the river must be in the neighborhood of a mile and a half. Further, the description in the patent is of certain lots in sections 23 and 26, and, manifestly, that was not intended to include land in sections 22 and 27. These considerations are conclusive that the water line, which was surveyed and made the boundary line of the lots, was the water line of the bayou or savannah, and there has been simply an omission to make any survey of the tract west of the bayou, and between it and the main body of the Indian river. It is unnecessary to speculate why it was that it was not surveyed. It may have been a mere oversight, or it may have been because the surveyors thought that the action of the water would soon wash the low land away; but, whatever the reason, the fact is obvious that no survey was made of that body of land, and the boundary line fixed was the water line of the bayou. * * * Although it was surveyed, it does not follow that a patent for the surveyed tract adjoining carries with it the land which, perhaps, ought to have been, but which was not in fact, surveyed. The patent conveys only the land which is surveyed, and, when it is clear from the plat and the surveys that the tract surveyed terminated at a particular body of water, the patent carries no land beyond it."

In conclusion the court said:

"So, in the case before us, obviously, the surveyors surveyed only to this bayou, and called that the river. The plaintiff has no right to challenge the correctness of their action, or claim that the bayou was not Indian river, or a proper water line upon which to bound the lots."

The conclusion we reach is that the meandered line was the boundary line of the Margaret Bailey patents, and that the marsh was public land, subject to survey and patent, and that appellees obtained the title under the patents to Hanna and La Corse. This conclusion affirms the opinion of Justice Harlan, who heard this case below, and who, in a memorandum opinion, said:

"My opinion is that the plaintiff is entitled to the relief asked in the bill. My conclusion rests upon the general ground that, while a meander line is ordinarily to be taken as showing only the quantity of land to be paid for by the purchaser, the meander line in this case must be taken as a line of boundary. I do not think that there was any intention, by the survey and patents under which the principal defendant claims, to pass the title to the marsh land between the 'meander' line and the islands. On the contrary, it must be taken that the intention was not to pass the title to that land. I concur entirely with what was said in James v. Howell, 41 Ohio St. 696. And that case is supported in principle by Horne v. Smith, 159 U. S. 40, 15 Sup. Ct. 988."

The decree is in all things affirmed.