TOLLESTON CLUB OF CHICAGO v. LINDGREN ET AL.

[No. 5,563.    Filed April 27, 1906.    Rehearing denied December
14, 1906.    Transfer denied February 5, 1907.]

1. STATUTES.—Sales.—Swamp Lands.—Deeds.—Quantity Con-
veyed.—Under the act of 1852 (1 R. S. 1852, p. 471), provid-
ing for the sale and conveyance of swamp lands, it was the
manifest intention to sell a specific number of acres and at
not less than $1.25 per acre.    p. 452.

2. SAME. — Construction. — Sales.—Swamp Lands.—Public Offi-
cers.—The act of 1852 (1 R. S. 1852, p. 471), providing that
certain officers should sell the swamp lands belonging to the
State, should be strictly construed in favor of the State.
p. 452.

3. DEEDS.—Swamp Lands.—Amount Conveyed.—Statutes.—A
deed conveying certain designated swamp lands fronting on a
morass, as authorized by the act of 1852 (1 R. S. 1852, p.
471), does not convey title to any part of such morass, espe-
cially where the grantee, and later, his heirs, claimed title
only to the designated swamp land.    Tolleston Club v. State,
141 Ind. 197, and Tolleston Club v. Clough, 146 Ind. 93, dis-
tinguished.    p. 452.

4. BOUNDARIES.—Official Surveys.—Meander Lines.—Deeds.—
Meander lines in an official survey are not usually boundary
lines, but are ordinarily used as a means of determining the
quantity of land in the fractional tract.    p. 453.

5. SAME.—Deeds.—Swamp Lands.—Statutes.—The sale, by the
State, of certain described lands bordering on a morass, being
divided therefrom by a meander line officially established, con-
fers title on the grantee only up to such meander line, and he
obtains no title thereby to the morass, the statute (1 R. S.
1852, p. 471) directing sales to be made by the acre and at a
specific price per acre.    p. 454.

From Lake Circuit Court; *Johannes Kopelke,* Special
Judge.

Suit by John Lindgren and others against the Tolleston
Club of Chicago.    From a decree for plaintiffs, defendant
appeals.    *Reversed.*

*John B. Peterson, Addison C. Harris* and *Frank C.
Cutler,* for appellant.

*Milo M. Bruce* and *Otto J. Bruce,* for appellees.

ROBINSON, J.—Suit by appellees to quiet title to section twenty-one, township thirty-six north, range eight west in Lake county. The complaint is in the ordinary form of a suit to quiet title. Demurrer to the complaint overruled. Answer by appellant in two paragraphs: (1) General denial; (2) that on February 25, 1873, the United States then owning the land, congress passed an act for the survey and sale of the same, which was done, and the land was conveyed to divers purchasers, and patents were issued under which the purchasers became seized in fee and from whom by mesne conveyances appellant holds title. Decree was rendered upon the finding in appellees' favor that they are the owners of the southeast quarter of the above section, and quieting their title.

The land in question was surveyed in 1834, and that part containing sections sixteen and twenty-one, as the same appear on the United States survey map of 1836, is as follows:

Under the act of congress of September 28, 1850 (9 U. S. Stat., p. 519), the land in question, with other lands, was selected by the State as swamp lands, and in 1853 a patent was issued to the State by the United States. Appellees claim title through mesne conveyances from Aaron N. Hart, to whom patents were issued by the State. These patents, dated January 12, 1857, convey, "lot one, of section twenty-one, in township thirty-six north, of range eight west, containing 69.10 acres, be the same more or less," consideration $50; also "lot two" of the same section, "containing 65.55 acres, be the same more or less," consideration $81.94; also "lot three" in the same section, "containing sixty-four acres, be the same more or less," consideration $58; and "lot four" of the same section, "containing 60.50 acres, be the same more or less," consideration $75.63.

The decree rendered quieted appellees' title to the southeast quarter of section twenty-one. The actual controversy, as presented by the assignment of errors, is whether appellees have a prevailing title to the strip north of lots one and two and south of the half-section line; that is, did the State, in the patents issued to Hart in 1857, convey all the land in section twenty-one? It has been held that the title to the whole of section twenty-one passed to the State from the United States. *Tolleston Club* v. *State* (1895), 141 Ind. 197; *Tolleston Club* v. *Clough* (1896), 146 Ind. 93. The title passed to the State through the provision of the act of congress approved September 28, 1850, and the lands were granted to the State to enable the State "to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein." The sales made by the State on January 12, 1857, were made under the swamp-land act of May 29, 1852 (1 R. S. 1852, p. 471 *et seq.*). The title of that act is "An act to regulate the sale of the swamp lands donated by the United States to the State of Indiana, and to provide for the draining and reclaiming thereof, in accordance with the condition of said grant."

The act of 1852 (§§1, 2) provides that the county auditor and county treasurer shall be the State's agents to sell the land, and fixes the treasurer's bond; (§3) that the Auditor of State shall cause to be prepared maps or plats of all swamp lands in each county and forward the same to the county auditor; (§§4, 5) that the auditor shall give notice of the sale, shall offer lands for sale at the courthouse, at public auction, in legal subdivisions, as near as practicable in half quarter sections; (§6) that "each tract of land so offered for sale shall be struck off to the highest bidder therefor, for any sum not less than $1.25 for each acre in the tract;" (§7) that the auditor shall give to the purchaser a brief certificate stating the name of the purchaser, the tract or tracts purchased by him, the number of acres contained in such tract or tracts, and the price per acre at which the same was sold; (§§8, 9) that the certificate holder shall present the certificate to the treasurer, pay him the whole amount of the purchase money, and that the treasurer shall give to the purchaser a duplicate receipt, "specifying therein the date of the receipt of the money, the name of the purchaser, the amount paid for each acre, the number of acres in the tract or tracts, the county, congressional township, range and section in which the tract or tracts are situated" (the act providing that the receipt should be substantially in the form set out in the act); (§13) that the county auditor shall enter in a book, kept by him for that purpose, "a brief description of each tract of land purchased, the number of acres contained therein, the price paid for each acre, the name of the purchaser or purchasers, and the date of the purchase;" (§12) that the treasurer shall forward to the Auditor of State a certified copy of the record of certificates issued by him to purchasers; (§14) that the Auditor of State shall prepare the deeds to the purchaser upon the receipt of the returns from the treasurers, and that the deeds shall be signed by the Governor and attested by the Secre-

tary of State; (§§26, 29) that the moneys received shall constitute a special fund to be used in paying expenses of selecting, platting, and selling lands, expense of reclaiming the land by ditching or dyking, and the balance "shall constitute a portion of, and belong to, the common school fund of the State, as in the Constitution provided;" (§37) the unsold lands were made "subject to entry at the sum of $1.25 the acre."

Upon the plat of 1836 (the survey of 1834) the river is marked as a distinct stream, and the land between the meander lines is marked as an "impassable morass." There is no question of riparian ownership. The territory between the meander lines was surveyed as land (*Tolleston Club v. State, supra; Tolleston Club v. Clough, supra*), and the impassable morass or "tract of soft, wet ground" (Webster's Dict.), between the meander lines and outside the space occupied by the river itself, was a part of the swamp land conveyed to the State; that is, the meander line was a line drawn between one kind of land and another kind of land, and manifestly was run to ascertain the quantity of one kind of land, which quantity was afterward sold by the acre as the statute directed. Manifestly it was the intention of the legislature that the land should be sold under the act of 1852 for not less than $1.25 an acre.

The only authority the public officers had to sell the land was that given them by this statute. Such a statute should be strictly construed. *State v. Portsmouth Sav. Bank* (1886), 106 Ind. 435, 451. If the morass was swamp land, and it was, there is no authority for saying that the legislature intended that the officers might sell that part of a section outside of the morass and make a gift to the purchaser of that part of the section in the morass. The officers had authority to sell the land by the acre, and the patents show it was so sold and conveyed. These patents did not convey land fronting on a lake or river, but upon a swamp

or morass, which must be treated as land, and not as water.
The four patents show that the State conveyed 259.15 acres,
which is the aggregate of lots 1, 2, 3, and 4, as surveyed
and marked on the plat. The patents themselves furnish
no evidence that more than the specified number of acres
was intended to be conveyed. Nor is there any evidence
that the grantee, Aaron N. Hart, obtained more than the
area included in lots 1, 2, 3, and 4 by the patents. More-
over, when the heirs of Hart had partition of the land it
was averred in the petition that he died the owner of the
fractional south half of section twenty-one, township thirty-
eight, range eight west, 259.15 acres, and it was found by
the court that the heirs owned in common the fractional
south half of section twenty-one, 259.15 acres, and the com-
missioners set apart to one of the heirs, and a grantor of
one of the appellees, the same amount of land and by the
same description. We do not understand that the cases of
*Tolleston Club* v. *State, supra,* and *Tolleston Club* v.
*Clough, supra,* decide the point in question in this case.
In the former it does not appear that the land was conveyed
by quantity as in this case, and in that case the court said
on page 222: "So far as any rights which the State or
border-lot owners may have as to the manner in which the
State and the border-lot owners have treated the sales made
by the State, such questions, if properly presented, may be
considered on the return of the case to the trial court."

Whether the meander lines were not made boundary lines
when section twenty-one was surveyed in 1834 is not con-
trolling. A meander line in an official survey is
not a line of boundary, but, as said in *Horne* v.
*Smith* (1895), 159 U. S. 40, 15 Sup. Ct. 988, 40
L. Ed. 68, is used "as a means of ascertaining the quantity
of land in the fraction which is to be paid for by the pur-
chaser." However, the public officers, in making sales of
the lands, might adopt a meander line as a boundary. "If
the meander line," said the court in *Tolleston Club* v. *State,*

*supra,* "in this case were actually or by necessary implication, made a boundary of the lands sold, it is, of course, evident that such boundary would stand just as any other boundary named or described." In *Niles* v. *Cedar Point Club* (1898), 85 Fed. 45, 29 C. C. A. 5; *Niles* v. *Cedar Point Club* (1899), 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171, a patentee of dry land bordering on an "impassable marsh covered with water" claimed title into the marsh. It apeared that the survey was not extended into the marsh. It was held that the meander line was run as a boundary, and not merely for the purpose of ascertaining the quantity of dry land paid for. The court said: "It was called a marsh by Rice, the first surveyor, is so styled on the plat, and the conditions as disclosed by the agreed statement of facts indicate that it was a body of low, swampy land, partly boggy and partly dry, sometimes subject to inundations from Lake Erie or the overflow of the adjacent streams, but not permanently covered with water. Of course, if the fractional sections patented to Margaret Bailey did not border on some body of water, there were no riparian rights, and if the conclusion of the trial court that this marsh was land (for swamp and boggy land is to be treated as land) was correct, then whatever changes may have come to the marsh—whether it became more or less subject to overflow—would not alter the fact that the rights of Margaret Bailey, the patentee, were limited to the very lands which were conveyed to her, and for which she paid, and did not extend over the meander line into the territory north." See, also, *State* v. *Portsmouth Sav. Bank, supra.*

Appellant claims title to the land in dispute through conveyances under a survey made in 1872 under the act of congress of 1870 declaring this morass to be the property of the United States and that the same had never been surveyed or sold. But it has been held that by the act of 1850, *supra,* the title to these lands

passed to the State, and that at the time of the passage of the act of 1870, *supra,* the United States had no claim or title to them. *Tolleston Club* v. *State, supra; Tolleston Club* v. *Clough, supra.* However, as appellant is not asking for any affirmative relief, it is not necessary to inquire what, if any, title it has to the land. Our conclusion is that under the swamp-land act of May 29, 1852 (1 R. S. 1852, p. 471), the officers had no power to sell the lands for less than the price fixed therein for each acre in the tract; that when the patents stated not only the number of the lots, but the quantity of land in each lot within the meander line, it was the intention of the State to convey only to the meander line; and that the meander line was adopted as the north boundary line of each lot sold. The exact question here presented seems not yet to have been decided in this State, but the conclusion reached is believed to be in harmony with the construction of the acts of congress touching like United States surveys as held in the case of *Niles* v. *Cedar Point Club, supra.* The motion for a new trial should have been sustained.

Decree reversed.