STATE OF INDIANA v. TUESBURG LAND
COMPANY ET AL.

[No. 8,794. Filed June 25, 1915. Rehearing denied February 4, 1916. Transfer denied April 6, 1916.]

1. QUIETING TITLE.—Actions.—Burden of Proof.—The plaintiff in an action to quiet title has the burden to prove that it had title when the action was commenced and such burden is not discharged by proof that defendant has no title. p. 574.

2. PUBLIC LANDS.—Title to Public Lands.—The question of whether the title to lands belonging to the United States has passed from the government must be determined by the laws of the United States. p. 575.

3. PUBLIC LANDS.—Swamp Lands.—Title of State.—Title by the State to reclaimed lands without the meander lines described in the patent of the United States conveying swamp lands to the State, can not be supported on the theory that if marsh lands or nonnavigable waters are included within the meander line of a government survey on which fractional lots abut, such marsh land or water inside the meander line will be considered to have been surveyed and the lines of the survey extended or protracted across the meandered territory so as to embrace a full subdivision so partially surveyed, and that hence a patentee of the government of such subdivisions or lots takes of the unsurveyed territory an amount sufficient to complete his subdivision. p. 576.

4. WATERS AND WATERCOURSES.—Riparian Owners.—Boundaries.— Swamp Lands.—A conveyance of land bounded by a nonnavigable stream carries with it the bed of the stream to the center, unless a contrary intention is manifest; but where land conveyed is described by a meander line run between such land and unsurveyed marsh or submerged land lying next to the stream, the title of the purchaser is limited to the land included within the survey. p. 581.

5. PUBLIC LANDS.—Swamp Lands.—Acquisition of Title by State.— A patent or at least a selection of land surveyed and the approval

of such selection by the Secretary of the Interior, is a necessary prerequisite to the State's acquisition of title to lands under the Federal Swamp Land Act. p. 582.

6. PUBLIC LANDS.—*Patents.*—*Construction.*—A patent usually conveys only land which has been surveyed, though in the case of patents issued under the Federal Swamp Land Act, where the land surveyed consists of fractional subdivisions or lots abutting unsurveyed submerged lands or marsh, the rule seems to be that the question of whether title to the unsurveyed territory passed from the United States by virtue of a patent of the surveyed land is dependent on the law of the State where the land is located. p. 583.

7. BOUNDARIES.— *Surveys.*— *Natural Monuments.*—Natural monuments will prevail as against other calls in survey. p. 587.

8. WATERS AND WATERCOURSES.—*Boundaries.*—*Meander Lines.*— As a general rule meander lines run in surveying fractional portions of the public lands along streams are merely for the purpose of defining the sinuosity of the banks and for ascertaining the quantity of land subject to sale, and are not to be considered as boundaries unless it appears that such was the intention of the parties to the instrument of conveyance. pp. 587, 588.

9. PUBLIC LANDS.—*Surveys.*—*Construction.*—Under the second section of the Act of Congress of 1796, providing that navigable rivers shall not be included in public surveys, though the question whether a given river is to be included in a survey is within the discretion of the surveyor, his decision is not conclusive. p. 588.

10. PUBLIC LANDS.—*Swamp Lands.*—*Title of State.*—*Extent.*— In view of the language of the Federal Swamp Land Act of 1850, and of the patents issued thereunder by the United States to the State, as well as of the plat describing the sections as abutting on a meander line purporting to be that of the Kankakee, a non-navigable river, rather than a boundary line between surveyed land, and unsurveyed submerged territory, all of which evidences the intention of the federal government to cede all the unsold swamp land in the State, the State acquired title to such unsurveyed submerged territory either by virtue of such patents, or under the doctrine of riparian ownership; the method of acquisition being dependent upon whether submerged land was considered as swamp land or as a portion of Kankakee River. p. 588.

11. PUBLIC LANDS.—*Swamp Lands.*—*State Patents.*—*Scope of Conveyances.*—Though the State acquired title to unsurveyed territory or marsh along the Kankakee River from the United States, it did not, in conveying to individuals under patents describing the land as described in the plats and patents of the United States, part with title to such submerged land, since such grants were made pursuant to the State Swamp Land Act of 1852 (1 Rev. Stat. 1876 p. 952), providing for the platting of swamp lands and their sale at a stipulated sum per acre, and that the proceeds were to be

used in paying for the sale of the lands, etc., and the grants, being statutory, are to be construed in view of the purposes and intention disclosed by such act.   pp. 592, 594, 597, 604, 607.

12.  WATERS AND WATERCOURSES.—*Meander Lines.—Boundaries.*— In determining whether the meander line of a stream should·be regarded as a boundary beyond which a grantee may not claim title, the intention of the parties to the instrument, as gathered from the instrument itself, or if the instrument is ambiguous, as gathered in the light of facts and circumstances existing at the time the instrument was prepared, should always have an important if not a controlling influence.   p. 592.

13.  BOUNDARIES.—*Surveys.—Natural Monuments.*—The influential reason for the rule favoring natural monuments over other calls in a survey, rests on the presumed intention of the parties to convey the lands actually surveyed, and the presumption that natural monuments are less likely to be mistaken than other calls, and include and bound the lands so·surveyed; but where the reason for the rule does not exist, the rule itself ceases.   p. 593.

14.  PUBLIC LANDS.—*Patents.—Construction.*—In interpreting a patent all contained in the patent must be considered, and the identity of the land ascertained by reasonable construction thereof, rejecting if necessary any erroneous call, and especially is this true where the survey was not actually run on the ground.   pp. 597, 604, 607.

15.  BOUNDARIES.—*Riparian Rights.—Meander Lines.*—The doctrine of riparian ownership applies only where the watercourse is in fact the boundary of the lands to which the doctrine is sought to be applied, and where there is uncertainty as to whether the meander line or the watercourse was intended as the boundary, in determining such question reference must be had to the conveyance to the party claiming the application of such doctrine and to the time of such conveyance, and not to a remote time or conveyance.   p. 602.

16.  PUBLIC LANDS.—*Swamp Lands.—Sale by State.—Authority of Officers.*—The officers of the State authorized to act for the State in the sale of its swamp lands, were as effectively bound and limited in their authority by the act of the legislature, as an agent of an individual would be, acting under the same express authority in writing, and persons purchasing through the agents of the State were charged with knowledge of the authority under which such agents acted.   p. 606.

17.  COURTS.—*Appellate Court.—Following Decisions of Supreme Court.*—Although a cause in the Appellate Court involves questions as to which there is apparent conflict in the decided cases of the Supreme Court, where the principle on which the opinion must be based has been given recognition in both the earlier and later of those decisions, as well as in those of the United States Supreme Court, the Appellate Court is not deprived of jurisdiction under

§1394 Burns 1914, Acts 1901 p. 565, but may follow those cases which it may deem to be supported by the better reason and authority.  p. 607.

From Laporte Circuit Court; *James F. Gallaher*, Judge.

Action by the State of Indiana against the Tuesburg Land Company and others.  From a judgment for defendants, the State appeals.  *Reversed.*

*Thomas M. Honan*, Attorney-General, *Adam Wise* and *J. E. McCullough*, for the State.

*Will R. Wood, Grant Crumpacker, E. D. Crumpacker, Owen L. Crumpacker* and *Osborn, McVey & Osborn*, for appellees.

HOTTEL, J.—This is an appeal from a judgment against appellant, the State of Indiana, in an action wherein it is sought to quiet title to something over 3,700 acres of land situate in Laporte and Starke counties.  The suit was filed in the Starke Circuit Court and a trial in that court resulted in a finding and judgment against the State.  On separate motions made by appellant, a new trial as of right was granted and the cause was venued to the Laporte Circuit Court.  A trial in that court resulted in the finding and judgment hereinafer indicated.

The complaint was in two paragraphs, each of which alleges that the appellant is the owner in fee simple of the real estate in controversy, and is in the usual form of a complaint to quiet title, the difference between the paragraphs being merely in the manner of describing the real estate.  The real estate is all in township 33 north, range 3 west, and the subdivisions of the sections involved are described in the first paragraph of the com-

plaint as follows: (We do not repeat number of township and in other respects abbreviate description.) In Laporte County: All that part of the S. hf. of the SE. qr., sec. 3, lying E. of the meander line of the U. S. survey. All that part of the SE. qr., sec. 19, lying E. of the meander line of U. S. survey. In Starke County: All that part of the S. hf. of sec. 21, lying between the meander line of the U. S. survey on the E. and the old channel of the Kankakee River on the W. All that part of the N. hf. of sec. 21, lying E. of the old channel of the Kankakee River. All that part of the NE. qr. of the NW. qr. of sec. 28, lying west of the meander line of the U. S. survey (in both Laporte and Starke counties). All that part of sec. 10, lying E. of the meander line of the U. S. survey. All that part of sec. 16, lying E. of the meander line of the U. S. survey. All that part of sec. 20, lying E. of the meander line of the U. S. survey. All that part of sec. 29, lying W. of the meander line of the U. S. survey. All that part of the E. hf. of sec. 30, lying between the meander lines of the U. S. survey. All that part of the NE. qr. of sec. 31, lying between the meander lines of the U. S. survey.

The second paragraph describes the real estate in controversy by courses and distances, following what is indicated on the government plat (which plat hereinafter appears in this opinion) as the meander lines of the Kankakee River and including all the territory between such lines consisting of something over 5,500 acres and then excepting therefrom section 14, and so much of section 11 as lies within such boundaries, and in Starke County, and excepting also that part of section 16, within such boundaries and section 15, in Laporte County.

Appellees, Pinney and Biddle, hereinafter re-

ferred to as P. & B. filed a cross-complaint in four paragraphs. A demurrer filed by appellant to each paragraph of this cross-complaint was sustained as to the second and third paragraphs and overruled as to the first and fourth paragraphs. The first paragraph of cross-complaint was in the usual form to quiet title to all of sec. 21, in township 33 N., range 3 W., in Laporte and Starke counties, except the SE. qr., and the SE. qr. of the SW. qr. of said section.

For the reasons hereinafter indicated, it is not necessary that we set out the averments of said fourth paragraph further than to say that it seeks to reform the description of the real estate described in the letters patent issued by appellant to appellees, and to quiet title to the real estate included in the reformed description. A denial to each of the paragraphs of complaint and cross-complaint, by the respective defendants thereto, closed the issues.

Upon the issues thus formed there was a trial by the court, and a general finding as follows: "That the plaintiff is the owner in fee simple of all that portion of section 2, 11, 23, northeast quarter section 3, northeast quarter section 22, west half northwest quarter section 28, which lies within or between the meander lines of Kankakee River in said township and range, and is entitled to have its title quieted thereto; that the cross-complainants, Pinney and Biddle, are the owners in fee simple and should have their title quieted to all that portion of section 21, in said township and range, north and west of the thread of the Kankakee River, as the same was before the artificial straightening thereof; that as to all the other lands involved in the complaint the plaintiff is not the owner thereof." A motion for new trial filed by appellant was overruled and judgment

rendered in accord with the finding. The errors assigned and relied on for reversal by appellant are the rulings on its demurrer to the fourth paragraph of cross-complaint of appellees, P. & B., and the ruling on its motion for new trial.

Numerous questions relating to the admission of evidence are presented by appellant's motion for new trial, but the conclusion which we have reached on that ground of the motion which challenges the sufficiency of the evidence to sustain the decision of the trial court renders unimportant all other questions presented by the appeal, including that of the ruling on the demurrer to the fourth paragraph of P. & B.'s cross-complaint. We therefore go directly to a consideration of the question of the sufficiency of the evidence to sustain the decision of the trial court.

The appellant introduced in evidence the patent from the United States to the State for the lands in controversy, which is as follows:

"The United States of America. No. 2. To all to whom these presents shall come, greeting: Whereas, by the Act of Congress approved September 28th, 1850, entitled 'An Act to enable the State of Arkansas and other States to reclaim the "Swamp Lands" within their limits', it is provided that all the 'Swamp and Overflowed Lands', made unfit thereby for cultivation within the State of Indiana, which remained unsold at the passage of said Act, shall be granted to said State; and Whereas, in pursuance of instructions from the General Land Office of the United States, the several tracts or parcels of land hereinafter described have been selected as 'Swamp and Overflowed Lands', enuring to the said State, under the Act aforesaid, being situated in the District of Lands

subject to sale at Winamac, Indiana, to wit:"
(We abbreviate and change the order of the
descriptions.) Also W. hf. of SE. qr., the
W. hf. NE. qr., the NE. qr. of NE. qr. and the
W. hf. sec. 1, the E. hf. or lots Nos. 2, 3 and
4, the NW. qr. of the NE. qr., the E. hf. of
NE. qr. and the E. hf. of the SE. qr. sec. 2.
The W. hf. of NW. qr., the SE. qr. of the NW.
qr. and the SW. qr. or the W. hf. of SW. qr.
and lots Nos. 3 and 4 of sec. 3. The whole
of secs. 4, 5, 6, 7, 8, 9, 12, 13, 17, 18, 24 and
32. The whole of fractional secs. 10, 11, 15,
20, 21, 22, 23, 28, 29, 30 and 31. The E. hf. of
the SW. qr. of the SW. qr., the E. hf. of the
NW. qr., NW. qr. of the NW. qr. and the
E. hf. of SW. qr., sec. 19. The S. hf. SW. qr.
the W. hf. SE. qr. and the N. hf., sec. 25.
The NE. qr. of the SW. qr. and the N. hf.,
sec. 26. The N. hf. SE. qr. the SW. qr. and the
N. hf., sec. 27. The N. hf. of the NE. qr. and
the W. hf., sec. 38. The S. hf. of NW. qr.,
the N. hf. of SW. qr. and the NW. qr. of SE.
qr., sec. 35. All in Tp. 33 N., R. 3 W., "con-
taining in all fifteen thousand and eighty-
three acres and eleven-hundredths of an acre,
according to the Official Plats of Survey of
the said lands returned to the General Land
Office by the Surveyor General. And for
which the Governor of the said State of Indi-
ana did on the eighteenth day of December,
one thousand eight hundred and fifty-two
request a patent to be issued to the said
State, as required in the aforesaid Act. Now
therefore, know ye, That the United States
of America, in consideration of the premises,
and in conformity with the Act of Congress
aforesaid, have given and granted, and by
these presents do give and grant, unto the
said State of Indiana, in fee simple subject to
the disposal of the Legislature thereof, the
tracts of land above described. To have
and to hold the same, together with all rights,
privileges, immunities and appurtenances there-

to belonging, unto the said State of Indiana, in fee simple and to its assigns forever. In testimony whereof," etc.

Upon this evidence appellant rested its case. The appellees Tuesburg Land Company and Northern Trust Company, trustee, hereinafter referred to as T & N, then introduced in evidence numerous letters patent, twenty-seven in all, issued by the State to the several respective purchasers therein named, by which the State conveyed to such purchasers the marginal lots or surveyed subdivisions of the land outside of and abutting on what is indicated in the government plat as being the meander lines of the Kankakee River. Patent No. 23,440 is as follows:

"The State of Indiana. No. 23,440. $64.87 Letters Patent. To all to whom these Presents shall come, Greeting: Whereas, George H. Birch has filed, with the Secretary of State of the State aforesaid, the Certificate of the Auditor of State, whereby it appears that full payment has been made according to the provisions of an Act of the General Assembly of the State of Indiana, approved May 29, 1852, entitled 'An Act to regulate the Sale of the Swamp Lands donated by the United States to the State of Indiana, and to provide for the draining and reclaiming thereof, in accordance with the condition of said grant,' and also of the several Acts supplemental thereto, for the Lot No. One in the North West quarter of Section number Ten in Township number Thirty-three North, of Range number three West, containing Fifty one 90–100 acres, be the same more or less, situate in LaPorte County, where said lands were offered for sale. Now know ye, That the State of Indiana, for and in consideration of the sum of Sixty four 87–100 Dollars paid as aforesaid, as appears by Certificate number 23,440, has given,

granted, bargained and sold, and by these presents does give, grant, bargain and sell, unto the said George H. Birch and to his heirs and assigns, the said tract above described, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereto belonging to have and to hold the same forever. In testimony whereof," etc.

All the other patents are in form the same, except No. 54, which differs from the others in the manner of descriptions, viz., It describes the land by lot number, as follows: "Lot number 2 in section twenty-one (21), and lot number one (1) in section twenty-eight (28)", etc. These several patents show that each was made in accord with the description shown on the government plat, and also show that the State has conveyed the marginal lots or fractional subdivisions shown on such plat to abut on the Kankakee River, in so far as the finding of the trial court was against the State. In other words, in so far as the finding of the trial court was against appellant, it had, by said several patents, conveyed the marginal lots or subdivisions shown on such plat as being adjacent to and abutting on the Kankakee River.

The plat of the government survey of said township 33, on file in the State auditor's office, before referred to herein, was introduced in evidence by appellees. Appellant has filed with its brief a copy of this plat which we appropriate and make a part of this opinion, which plat is as follows:

Township Nº 33 N.   Range Nº 3 W.   2ⁿᵈ Mer.

Surveyed in 1835 by Jeremiah Smith,   Deputy Surveyor.

The original field notes on file in the state auditor's office from which the plat was made were offered, and over appellant's objection and exception, were admitted and read in evidence. These notes describe the character of the land in the different subdivisions of the territory outside of the meander lines, in the following words: "Nearly all marsh," "slough", "land covered with ice", "land all ice", "land a lake of ice", "all floating muck", "land a miserable floating marsh", "land all marsh or deep water", "land beggars description", "this town is not worth describing". It should also be stated that wherever, in the field notes, reference is made to the territory indicated on the government plat as "Kankakee River" it is always designated as "river" or "Kankakee River". Every section line indicated on said government plat, when referred to in the field notes as running from an established corner in any direction to a point where there is no established corner, is made to terminate at a point designated as being on the right or left bank of the "Kankakee River".

Appellees also introduced in evidence plats of said township 33 on file in the office of the auditor of Laporte County, and a like plat on file in the auditor's office in Starke County. These plats show the lands in controversy, and the lots and subdivisions of sections abutting on the meander line of the Kankakee River substantially as shown by the government survey.

The cross-complainants, P. & B. introduced in evidence the following certificates of which we indicate parts only: (1) A certificate of the auditor of state as to the correctness of the record of the following description of lands recorded in tract books in the State auditor's office, viz.,

fraction in the NW. corner of section 21, in township 33 north, of range 3 west, containing nine (9) and eighty-hundredths of an acre, patented to William B. Biddle and William E. Pinney, April 4, 1874, No. 24,636, vol. 54, page 356, Laporte County. Lot 1 in the SE. qr. of section 21, in township 33 north, of range 3 west, containing 65.60 acres, patented to A. G. W. Sherman, July 16, 1871, No. 24,401, page 119, Starke County. Lot No. 2 in the SE. qr. of section 21, in township 33 north, of range 3 west, containing 36.80 acres, patented to Edward Hawkins, November 25, 1884, No. 54, vol. X, page 54, sold under act of 1883, Starke County. (2) Copies of certificates of sales of swamp land, issued by the treasurer of Laporte County during the ninety days ending March 27, 1874. Treasurer's office, etc. "Received of William B. Biddle and William E. Pinney, of Laporte County, in the State of Indiana, the sum of twelve dollars and twenty-five cents, being the purchase money for the fractional part of section No. twenty-one (21) north and west of the Kankakee River, in township No. thirty-three (33) north, of range three (3) west, containing nine (9) and (80) hundredths of an acre, more or less which entitles the said William B. Biddle and William E. Pinney to a deed from the State of Indiana for said land on presentation of this certificate to said treasurer. G. W. Mecum, treasurer of Laporte County." No. 24,637. Treasurer's Office, etc. "Received of William E. Pinney of Laporte County in the State of Indiana the sum of eight dollars and sixty cents, being the purchase money for the fractional part of section No. fifteen (15) north and west of the Kankakee river, in township No. thirty-three (33) north, of range three (3) west, containing six (6) acres and ninety (90) hun-

dredths of an acre more or less, which entitles,"
etc. Here follows the respective certificates of the
treasurer and auditor of Laporte County and of
the auditor of state, certifying to the correctness of
the above, which we need not set out.

P. & B. also offered and read in evidence their
patent from the State which is as follows:

"No. 24,636. $12.25. The State of Indi-
ana. Letters Patent. To all to whom these
presents shall come, Greeting: Whereas, Wil-
liam B. Biddle and William E. Pinney have filed
with the Secretary of State of the State afore-
said, the Certificate of the Auditor of State,
*whereby it appears that full payment has been
made according to the provisions of an Act of
the General Assembly of the State of Indiana,
approved May 29th, 1852, entitled 'An Act to
regulate the sale of the swamp lands donated
by the United States to the State of Indiana,
and to provide for the draining and reclaiming
thereof, in accordance with the condition of
said grant', and also of the several Acts supple-
mental thereto,* for the fractional north west
quarter of Section number Twenty one (21),
in Township number Thirty three (33) north,
of Range number three (3) West, containing
Nine 80–100 acres, be the same more or less,
situate in LaPorte County, where said lands
were offered for sale. Now Know Ye, that
the State of Indiana, *for and in consideration
of the sum of Twelve 25–100 Dollars, paid as
aforesaid,* as appears by Certificate number
24,636, has given, granted, bargained and
sold, and by these presents does give, grant,
bargain and sell, unto the said William B.
Biddle and William E. Pinney, and to their
heirs and assigns, the said tract above de-
scribed, together with all the rights, privileges,
immunities and appurtenances of whatsoever
nature thereto belonging", etc.

Appellees, T & N offered and read in evidence

a deed from the English Land Company to the
Tuesburg Land Company, which for the purposes
of this opinion need not be set out.

The oral testimony given in the case, briefly
stated, was to the following effect: Pinney tes-
tified that he purchased the land for himself and
Biddle; that he examined the plat on file in the
auditor's office of Laporte County before his
purchase; that he paid taxes on the land up to the
time of the litigation; that he had the land sur-
veyed to ascertain how much they might have
under their purchase; that they rented the land
to the English Land Company and did other
acts of ownership, etc. Charles H. Tuesburg
testified that, after receiving its deed from the
English Land Company, the Tuesburg Land Com-
pany took possession thereunder and has ever
since continued in possession of the lands de-
scribed in its deed; that it made improvements
on the land, cultivated a part, including some of
the land within the meander lines; that it sold
marsh hay and did other acts of ownership, includ-
ing work of reclamation by ditching and cutting
timber both outside and inside the meander lines
of the Kankakee River; that the ditch constructed
by the Kankakee Reclamation Company in 1903,
1904 and 1905 through the territory involved was
simply a widening, deepening and straightening
of the old channel of the Kankakee River cutting
through the bends and furnishing an artificial
channel for such river.

George D. Parks testified in rebuttal concern-
ing a survey made by him in the year 1901, under
the direction of Governor Durbin, by which he
surveyed all the lands involved; that he did not
run on the face of the ground, the meander lines
as laid down by the government survey, but that

he ran the section lines and made notes from where those section lines crossed the meander lines and then in preparing the plat, from the government courses and distance of the survey made by Jeremiah Smith, he, Parks, platted on his plat the meander lines, checking it up with the notes he made in his survey; that he did not run along the meander lines; that, on both sides of the river, he ran all of the section lines that embraced any land in any section within the meander lines and platted on his plat the meander lines and their true location on each side of the river; that some of the notations which he made on the plat between the meander lines are technical marks that indicate where trees are located and where fresh marsh land exists; that the marsh land is indicated by short marks, three or four side by side and underlined with a short horizontal line; that the locations of trees are indicated by short broken curved lines; that the river had definitely defined banks; that when he made his survey there was along the banks, in places, a growth of ash, maple, elm, willow and sycamore timber; that the longest distance from the meander line to the channel of the river or banks that he noted was along the south lines of sections 14, 15 and 16, where the distance is about two miles and a quarter; that the nearest point is where the river crosses the north boundary line of the township; that he measured between the banks at that point when he made his survey and it was then 114 feet between the banks; that between the banks of the river proper and the meander line at the time he made his survey, beginning in section 2, the growth of trees was almost entirely on the west side of the river; that near the north half of the section there were but very few trees, but the south half of the sec-

tion, between the river and the section. line, was all covered with trees; that this growth of trees extended into section 3 for several hundred feet; that there was a growth of trees in section 10 several hundred feet in width on the west side of the river, and between the section line and the river on the east side it was covered with trees; that there were some trees in section 11 on the east bank of the river, and the line between sections 10 and 11 ran through a forest all the way; that in section 21 there were trees growing upon both banks of the river, extending from a few feet to several hundred feet on either side; that there were a few trees in section 20, down in the southeast corner on the north bank of the river; that in section 29 there were a few trees on either side of the river; that in section 30, for a distance of a half mile along the river line, there were a few trees on either side; that the trees varied from the smallest timber in size up to (some few) trees as large perhaps as two feet in diameter, but the most of them were less than a foot in diameter; that the most of the larger trees had been cut off; that this was shown by the stumps; that some of the stumps would run as high as three feet in diameter, but many of them were from eighteen inches to two feet, and were mostly ash and maple, with some sycamore and a few black gum; that there was then no cultivated land between the meander lines except a little in section 14; that the rest of the growth, besides the trees mentioned, was marsh grass, cane brakes, rose briars, weeds and other grasses, that are usually found in a fresh marsh.

A copy of the plat of the survey made by Mr. Parks is set out in appellant's brief and we appropriate it and make it a part of this opinion. It is as follows:

State *v.* Tuesburg Land Co.—61 Ind. App. 555l.

TOWNSHIP 33 NORTH  R.3 W  2ª PRIN MER

Appellant introduced a number of other witnesses who resided along the Kankakee River and who testified in rebuttal as to the location of the Kankakee River since they had known it, the character of its banks, the width of the stream within its banks, the extent of the wet and overflowed land outside of its banks, and between such banks, and the meander lines of such river as shown by the plat of the government survey before set out herein, the character of the vegetation and timber on such land, etc.

It is not necessary, however, to proceed further with the evidence. We have indicated enough thereof to show that the controlling facts in the case are not disputed. They are as follows: The lands conveyed by the United States patent involved in this suit are described as fractional sections, except as to sections 1, 2 and 3 where the portions conveyed are described as lots or other fractional subdivisions of a section. The patent by which the State obtained its title and the several patents through which it passed title, in terms convey nothing but surveyed lands, and describe surveyed lands only; that is to say, they describe only sections, fractional sections, lots or subdivisions of sections which have no existence independent of a survey. The acreage conveyed by the patent from the government corresponds to the acres contained in the surveyed lots and subdivisions and does not include the acreage in the unsurveyed or meandered territory. The land in dispute lies wholly within the boundary lines of what is designated on the government survey as "Kankakee River", and represents only that territory necessary to, and which does in fact complete the fractional sections and subdivisions thereof designated and indicated on said plat as sur-

veyed and as being bounded by the meander line of such river. In other words, the fractional sections bounded by the meander lines of the territory designated on such plat as "Kankakee River" are made fractional by reason of the meandering of such river; and, by extending the section, half-section and quarter-section lines, indicated on said plat, through the territory lying between the meander lines of said river such abutting fractional sections and subdivisions of sections will be perfected and completed. The State by its patent obtained title to all the fractional sections, lots and subdivisions of sections, indicated on said plat as actually surveyed and as being adjacent to the territory delimitated by the meander lines of the Kankakee River. As shown by the plat, the lines of the survey were not actually run across the territory indicated on the plat as "Kankakee River", and consequently there was no attempt made at the time of such survey to subdivide into legal subdivisions the territory, whether land or water, included between the meander lines. On the contrary, the lines of survey were in fact run around the rim or edge of such territory and the fractional lots resulting from the meander lines were given numbers.

Do these facts uphold the finding and decision of the trial court before indicated? This being an action by the State to quiet its title to the

1. lands in controversy, the burden is on it to prove that it had title when it began this action. This burden can be discharged by proof of its own title and not by proof that the defendants have no title. §1103 Burns 1914, §1057 R. S. 1881; *Craig* v. *Bennett* (1897), 146 Ind. 574, 45 N. E. 792; *Blake* v. *Minker* (1894), 136 Ind. 418, 36 N. E. 346; *Graham* v. *Lunsford*

(1897), 149 Ind. 83, 48 N. E. 627; *Crotz* v. *A. R. Beck Lumber Co.* (1905), 34 Ind. App. 577, 585, 73 N. E. 273. It follows that our first inquiry should be whether the State ever obtained title to the land in dispute. As hereinbefore · indicated, the State depends for its title on the patent issued to it by the United States government under the Swamp Land Act passed by Congress in 1850, and hence the determination of the question suggested requires us to determine whether the United States government by such act and its patent issued thereunder parted with title to the land in controversy. Under the great weight of authority the question, whether title to land which

2. was once the property of the United States government has passed from it, wherever presented, whether in a state or Federal court, must be determined by the laws of the United States. *Irvine* v. *Marshall* (1858), 20 How. 558, 15 L. Ed. 994, 999; *Wilcox* v. *Jackson* (1839), 13 Pet. *498, 10 L. Ed. 264, 273; *United States* v. *Gratiot* (1840), 14 Pet. *526, *537, 10 L. Ed. 573, 578; *Gibson* v. *Chouteau* (1872), 13 Wall. 92, 20 L. Ed. 534, 536; *Packer* v. *Bird* (1891), 137 U. S. 661, 11 Sup. Ct. 210, 34 L. Ed. 819; *Shively* v. *Bowlby* (1894), 152 U. S. 1, 34, 14 Sup. Ct. 548, 38 L. Ed. 331, 347; *St. Anthony Falls, etc., Co.* v. *Board, etc.* (1897), 168 U. S. 349, 18 Sup. Ct. 157, 42 L. Ed. 497, 502; *Gutierres* v. *Albuquerque Land, etc., Co.* (1903), 188 U. S. 545, 23 Sup. Ct. 338, 47 L. Ed. 588; *United States* v. *Rio Grande Dam, etc., Co.* (1899), 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136, 1142; *Bagnell* v. *Broderick* (1839), 13 Pet. *436, 10 L. Ed. 235; Act of July 26, 1866 (14 Stat. at Large 253, Chap. 262); Act of March 3, 1877 (19. Stat. at Large 377, Chap. 107); Act of March 3, 1891 (26 Stat. at Large

1095, Chap. 561); Act of June 17, 1902 (32 Stat. at Large 388). However, there seems to be an exception to, or a departure from, this rule in the case of *Hardin* v. *Jordan* (1891), 140 U. S. 371, 11 Sup. Ct. 808, 35 L. Ed. 428; and *Mitchell* v. *Smale* (1891), 140 U. S. 406, 11 Sup. Ct. 819, 35 L. Ed. 442, the latter case being based on the former, and the case of *Kean* v. *Calumet Canal, etc., Co.* (1903), 190 U. S. 452, 23 Sup. Ct. 651, 47 L. Ed. 1134, to which cases we will have occasion to refer later in this opinion.

It is insisted by appellees, in effect: (1) that the lands involved, though shown on the government plat as lying within the meander lines designated as "Kankakee River" were surveyed, and that, if surveyed, the marginal lots shown upon the plat to abut upon such river extend to the extreme boundaries of the sections and hence that the patents of the United States and of the State, by conveying the marginal lots or fractional sections and subdivisions thereof, necessarily included the abutting territory which was necessary to complete such fractional sections, or subdivisions thereof; (2) that, if such lands are in fact unsurveyed and the patent of the United States covers them (as is claimed by appellant), it does so by virtue of the common-law doctrine of riparian ownership, and hence that the patents issued by the State, by reason of the same doctrine, have deprived the State of its title. Upon the question first suggested, there are two lines of decisions of our Supreme Court, which may be divided as follows: (1) Those prior to *Stoner* v. *Rice* (1889), 121 Ind. 51, 22 N. E. 168, 6 L. R. A. 387, viz., *Ross* v. *Faust* (1876), 54 Ind. 471 23 Am. Rep. 655; *Ridgway* v. *Ludlow* (1877), 58 Ind. 248; *Edwards* v. *Ogle* (1881), 76 Ind. 302;

*State* v. *Portsmouth Sav. Bank* (1886), 106 Ind. 435, 459, 7 N. E. 379. (2) The case of *Stoner* v. *Rice* and those subsequent to it, viz., *Brophy* v. *Richeson* (1894), 137 Ind. 114, 36 N. E. 424; *Tolleston Club* v. *State* (1895), 141 Ind. 197, 38 N. E. 214, 40 N. E. 690; *Kean* v. *Roby* (1896), 145 Ind. 221, 42 N. E. 1011; *Tolleston Club* v. *Clough* (1896), 146 Ind. 93, 43 N. E. 647; *Mason* v. *Calumet Canal, etc., Co.* (1898), 150 Ind. 699; *Gary Land Co.* v. *Griesel* (1913), 179 Ind. 204, 100 N. E. 673. Whether each of these cases in its class may be reconciled with the other cases of its class may be open to doubt, but that there is conflict between cases of the one class with cases of the other class seems certain.

A review of these decisions in so far as they affect the subject involved is well elucidated by Mr. Justice White in a very able dissenting opinion rendered by him in the case of *Kean* v. *Calumet Canal, etc., Co., supra.* (Same case, *Mason* v. *Calumet Canal, etc., Co., supra.*) An examination and careful study of his review of these cases and of his discussion and disposition of the same questions here involved will be enlightening and will at the same time disclose the difficulty of ascertaining from the decided cases any sure and correct guide to a determination of the questions presented by this appeal. In speaking of the holding of the Indiana Supreme Court in the case of *Kean* v. *Calumet Canal, etc., Co., supra,* Justice White in such dissenting opinion said: "The court below held, although the United States survey had not, in fact, been extended beyond the meander line and the lots conveyed by the United States were described as fractional on the plat and in the patents, that the patentees yet took full sub-

divisions. The principle applied was this: Where marsh land or nonnavigable waters were within a meander line upon which fractional lots were abutted, the conveyance of such lots by the United States carries also the marsh land or nonnavigable water beyond the meander to the extent of a full subdivision. And, in order to accomplish this result, the marsh land and water inside of the meander will be considered to have been surveyed, and the lines of the survey be hence protracted across the meander so as to embrace a full subdivision. Whilst this theory was plainly irreconcilable with the construction given the United States law by the Supreme Court of Indiana in cases decided by it prior to *Stoner* v. *Rice, supra,* that case announced the rule, and the subsequent cases in Indiana have sanctioned it down to and including *Kean* v. *Roby, supra,* upon which the decision in this case was rested. In *Hardin* v. *Jordan, supra,* the doctrine of *Stoner* v. *Rice, supra,* was criticised as an unwarranted departure from the common law, and it was observed—as was undoubtedly the case—that the Indiana court, in *Stoner* v. *Rice, supra,* but adopted the rule announced by the Supreme Court of Michigan in *Clute* v. *Fisher* (1887), 65 Mich. 48, 31 N. W. 614, shortly before the decision in *Stoner* v. *Rice, supra.* Now, the opinion in *Clute* v. *Fisher, supra,* shows that the Michigan court in that case but followed a prior ruling made by it at the same term in, *Palmer* v. *Dodd* (1887), 64 Mich. 474, 31 N. W. 209. The latter case involved title to land within a section made fractional by a meandered lake or marsh, and the controversy turned upon whether, under the law of the United States, the rights of the owner of the fractional section extended beyond the me-

ander line. The Supreme Court of Michigan, in deciding the question, said: 'When the United States grants by patent land described by a legal subdivision, the grantee is entitled to all the land embraced within the legal subdivision contained in his grant, and is not limited by the number of acres specified in the patent or upon the government plat. The meanders have no significance as boundaries, and are not intended as such. They are run simply to afford a means of computing the area contained in the fraction which the United States requires payment for on sale of the public domain. But no grantee by such patent, granting a legal subdivision of land, can derive title to land upon another legal subdivision. This we have decided in the cases of *Wilson* v. *Hoffman* (1884), 54 Mich. 246, 20 N. W. 37; *Keyser* v. *Sutherland* (1886), 59 Mich. 455, 26 N. W. 865, which were based upon the decision of the Supreme Court of the United States in *Brown* v. *Clements* (1845), 3 How. *650, 11 L. Ed. 767'. It is, hence, apparent that the rule in *Clute* v. *Fisher, supra,* was based upon the construction of the law of the United States expounded by this court in *Brown* v. *Clements, supra.* But long prior to the decision in *Clute* v. *Fisher, supra,* this court, in *Gazzam* v. *Phillips* (1857), 20 How. 372, 15 L. Ed. 958, had reviewed the case of *Brown* v. *Clements, supra,* and decided that the sale of a fractional lot did not convey a full subdivision; and, in consequence of this view, the case of *Brown* v. *Clements, supra,* was expressly overruled. In subsequent cases in Michigan the fact that that court has mistakenly predicated its conclusion in *Clute* v. *Fisher, supra,* on a case which this court had overruled, has been conceded. *Grand Rapids Ice, etc., Co.* v. *South Grand Rapids Ice, etc., Co.* (1894),

102 Mich. 227, 60 N. W. 681, 25 L. R. A. 851. But, while the Michigan court has thus recognized the error into which it inadvertently fell in *Clute* v. *Fisher*, *supra*, the Indiana court has continued to apply that rule, although the sole authority upon which it rests has been repudiated."

It would seem therefore that the doctrine or rule declared in the case of *Stoner* v. *Rice*, *supra*, and followed in the later cases, to the effect that, where marsh land or nonnavigable waters are included within the meander line of a government survey on which fractional lots abut, such marsh land or water inside of the meander line will of considered to have been surveyed and the lines of the survey extended or protracted across the meandered territory so as to embrace a full subdivision so partially surveyed, and that a patentee of the government of such subdivisions or lots bordering on such meander line will be held to take of the unsurveyed territory an amount sufficient to complete and make full his subdivision, is now practically unsupported by authority in other jurisdictions. To us the principle seems not only to be without support of authority in other jurisdictions but we can see back of it no good reason for its existence, and it may, and must necessarily, in some cases, furnish the means of accomplishing a legal absurdity, as was demonstrated, we think, in the case of *Tolleston Club* v. *Clough*, *supra*, where the owner of the land would have been permitted to extend his lot or subdivision across the unsurveyed territory, and the meandered stream on which it abutted, and finished out his subdivision on the other side of such stream, but for the fact that he, in his pleadings, had limited his claim to the center of the stream.

There is, however, another rule of law which is

recognized by both appellant and appellees, and on which appellees insist that both the State's title and their title may be upheld— viz., the doctrine of "riparian ownership". Under this doctrine a grant or conveyance of land bounded by a nonnavigable stream carries with it the bed of the stream to its center, unless a contrary intention is manifest from the grant or conveyance itself. *Illyes* v. *White River Light, etc., Co.* (1911), 175 Ind. 118, 93 N. E. 670; *Irvin* v. *Crammond* (1915), 58 Ind. App. 540, 108 N. E. 539, and authorities cited. This doctrine was recognized at common law and is recognized and followed both by the Supreme Court of the United States and by the Supreme Court of this State. *Ross* v. *Faust, supra; Edwards* v. *Ogle, supra; Kean* v. *Roby, supra; John Hilt Lake Ice Co.* v. *Zahrt* (1902), 29 Ind. App. 476, 62 N. E. 509; *Brophy* v. *Richeson, supra; Illyes* v. *White River Light, etc., Co., supra; Kean* v. *Calumet Canal, etc., Co., supra; Sizor* v. *City of Logansport* (1898), 151 Ind. 626, 50 N. E. 377, 44 L. R. A. 814; *Knickerbocker Ice Co.* v. *Surprise* (1913), 53 Ind. App. 286, 97 N. E. 357, 99 N. E. 58; *Hardin* v. *Jordan, supra; Mitchell* v. *Smale, supra; Whitaker* v. *McBride* (1905), 197 U. S. 510, 25 Sup. Ct. 530, 49 L. Ed. 857. As hereinbefore indicated, the government plat shows that the meandered territory here involved was "Kankakee River". Such plat and the State's patent from the government show that the State has title from the government for *all* the fractional sections or subdivisions thereof abutting on the meander line of the river so meandered. It is not disputed that the Kankakee River is a nonnavigable river. It would follow therefore that the State by its patent, having obtained title to *all* the fractional

sections or subdivisions thereof bordering on such river under the doctrine of riparian ownership, would take title to the center of such stream and this would necessarily include all the land here involved. However, such taking by the State, under the law, would be predicated on the theory that there was a survey of the lands so selected by it under such act and that the natural monument, the river, was in fact the boundary of the several fractional sections, or subdivisions, indicated as abutting thereon. If the meander line, in fact, merely marked the boundary between surveyed and unsurveyed territory, it seems that under the weight of authority, the doctrine of riparian ownership would have no application, but the purchaser of the surveyed territory would be limited to that included within the survey. The weight of authority seems to be to the effect that a patent is also a necessary prerequisite to the State's acquiring title to lands under the Swamp Land Act. *Tol-*

5. *leston Club* v. *State, supra; Niles* v. *Cedar Point Club* (1889), 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171, 174; *Brown* v. *Hitchcock* (1899), 173 U. S. 473, 19 Sup. Ct. 485, 43 L. Ed. 772; *Rogers, etc., Mach. Wks.* v. *American Emigrant Co.* (1896), 164 U. S. 559, 574, 17 Sup. Ct. 188, 41 L. Ed. 552, 558; *Michigan Land, etc., Co.* v. *Rust* (1897), 168 U. S. 589, 592, 18 Sup. Ct. 208, 42 L. Ed. 591, 592; *Little* v. *Williams* (1913), 231 U. S. 335, 339, 340, 34 Sup. Ct. 68, 58 L. Ed. 256, 259. The Supreme Court in this State in some of its earlier cases announced a different doctrine, viz., that the acts of Congress upon the subject of swamp lands, by their own force, conveyed the title to such lands to the State. *Edmondson* v. *Corn* (1878), 62 Ind. 17, 21; *Matthews* v. *Goodrich* (1885), 102 Ind. 557, 564, 568, 1 N. E. 175; *State* v. *Portsmouth Sav. Bank;*

*supra; Tolleston Club* v. *State, supra.* However,
in the case of *Tolleston Club* v. *State, supra,* the Su-
preme Court, in an opinion on petition for rehearing
seems to have recognized such rule to be as first
indicated, or at least, holds that there must be a
survey of such lands and a selection thereof by the
State and an approval of such selection by the
Secretary of the Interior. It has also been
6. frequently declared by the Supreme Court
of the United States that a patent conveys
only land which has been surveyed. *Horne* v.
*Smith* (1895), 159 U. S. 40, 44, 45, 15 Sup. Ct.
988, 40 L. Ed. 68, 70; *West* v. *Cochran* (1855),
17 How. 403, 407, 15 L. Ed. 110, 113; *Security
Land, etc., Co.* v. *Burns* (1904), 193 U. S. 167, 24
Sup. Ct. 425, 48 L. Ed. 662, 668; *M'Ivers* v. *Walker*
(1815), 9 Cranch *173, 3 L. Ed. 694; *Niles* v.
*Cedar Point Club, supra*; *French-Glenn Live Stock
Co.* v. *Springer* (1902), 185 U. S. 47, 52, 22 Sup.
Ct. 563, 46 L. Ed. 800, 802; *Kean* v. *Calumet
Canal, etc., Co., supra,* 498. It will be seen from what
we have already said and from an examination of
the authorities cited, that the question under
consideration is not free from difficulty and that
there are many decided cases which seem to indi-
cate that the title to the land in controversy still
remains in the United States government. How-
ever, in the case of *Hardin* v. *Jordan, supra,* 379,
where the Supreme Court of the United States
was "called upon to decide whether the title of
the plaintiff, under the patent title granted to
her ancestor in 1841 extended beyond the limits
of the actual survey, under the permanent waters
of the lake in front of the land described in the
patent, and not merely to line of low-water mark,
as held by the court below", such court held, in
effect, that: (1) Meander lines along or near

the margin of a stream or other body of water are run to ascertain the quantity of public land sold and are not boundary lines; the waters themselves constitute the real boundary. (3) Grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie. (4) The common law is the law of Illinois as to the rights of riparian owners. (5) By the common law, fresh water lakes and ponds, except the great navigable lakes, belong to the owners of the soil adjacent, who own the soil *usque ad filum aquae*. This case is approved and followed in the case of *Mitchell* v. *Smale, supra.*

In the more recent case of *Kean* v. *Calumet Canal, etc., Co., supra,* decided by the Supreme Court of Indiana (*Mason* v. *Calumet Canal, etc., Co., supra*), and taken to the Supreme Court of the United States by writ of error, the latter court again approved and followed the case of *Hardin* v. *Jordan, supra,* and *Mitchell* v. *Smale, supra,* and in doing so, said: "For twelve years the decisions in *Hardin* v. *Jordan* and *Mitchell* v. *Smale* have stood as authoritative declarations of the law. Probably in most cases the statute of limitations has cured the defects of title which those cases may have shown. Meantime many titles must have passed on the faith of those decisions. The United States can meet them by the form of its conveyances. It seems to us that it would be likely to do more harm than good to allow them to be called in question now. It is said that the land under water was not embraced in the survey of 1834. It would seem from the plat and the field notes that the sections and divid-

ing lines were clearly marked off and posts set. The case is similar to *Kean* v. *Roby* [1896], 145 Ind. 221, 42 N. E. 1011, where the survey was pronounced sufficient. No difficulty was felt on the ground that the survey did not cover the submerged land in *Hardin* v. *Jordan, supra.* *But furthermore, the land was selected as 'swamp and overflowed lands' by the State. It not appearing otherwise, the selection must be presumed to have included the land overflowed, and if so it was confirmed to the State by the act of March 3, 1857,* Chap. 117, 11 Stat. at Large 251, Rev. Stat. §§2484 [U. S. Comp. Stat. 1901, p. 1588]. The confirmation encounters none of the difficulties of cases like *Stoneroad* v. *Stoneroad* [1895], 158 U. S. 240, 15 Sup. Ct. 822, 39 L. Ed. 966. *The land surrounding the water, at least, was surveyed, so that the identification of the submerged portion was absolute.* We are of opinion that the State of Indiana got a title to the whole land in dispute." (Our italics.)

It is proper in this connection to say that the three cases just cited are criticised and disapproved in a very able and exhaustive dissenting opinion written by Justice White and concurred in by Justice McKenna, in the case of *Kean* v. *Calumet Canal, etc., Co., supra.* It was in this opinion that the Indiana cases were reviewed and criticised as hereinbefore indicated. The case of *Hardin* v. *Jordan, supra,* and the other cases which follow it are especially criticised, because they seem to announce the doctrine that in such cases the question whether title to the land passed from the United States government should be determined by the law of the State where the land was located. It seems, however, that in *Hardin* v. *Jordan, supra,* all the members of the court did

not take the view that the opinion in that case declared the rule to be as broad as the interpretation given to it by Justice White. This appears from a dissenting opinion by Justice Brewer, joined in by Justice Gray and Justice Brown, in the case of *Hardin* v. *Jordan, supra,* 402, in which the following language is found: "Beyond all dispute the settled law of this court, established by repeated decisions, is that *the question how far the title of a riparian owner extends is one of local law.*" (Our italics.) Justice Brewer's opinion then proceeds with a discussion of the laws of Illinois and concludes that the law as announced and applied to the facts of the case by the lower court was correct. It seems, therefore, that, in *Hardin* v. *Jordan, supra,* some members of the court, at least, did not understand that such court was, in that case, announcing the broad doctrine, that in determining the question whether title to lands once owned by the government was passed by its patent, reference should be had to the local law rather than the law of the United States.

Going back to the dissenting opinion of Justice White in the case of *Kean* v. *Calumet Canal, etc., Co., supra,* we feel it proper to say that he, in a very thorough and exhaustive discussion of the question involved, each phase of which is supported by numerous authorities, · to our minds, greatly weakens the force of the majority opinion and makes a strong showing to the effect that territory included between meander lines, as in the case there involved and here involved, should be treated as unsurveyed; that the meander line in such case is a boundary line marking the extent of the surveyed territory and that a patent from the government conveying the fractional sections or subdivisions of land abutting on such meander

line conveys the surveyed territory only. However, the majority opinion in that case is now the law of the United States Supreme Court on the question involved and even though it may apparently be out of harmony with former cases of that court, we believe that in its application to the Swamp Land Act, especially when applied to the facts of a case like the one here presented, it follows both law and equity.

It may be and indeed we think it must be conceded that the territory marked "Kankakee River" on the government plat was not *actually surveyed*. It does not follow, however, that the meander line, rather than the river was intended as the boundary of the surveyed territory. The rule in 7. favor of natural monuments as against other calls in a survey is universal. *Illyes* v. *White River Light, etc., Co., supra; Emmons* v. *Kiger* (1864), 23 Ind. 483, 486; *Allen* v. *Kersey* (1885), 104 Ind. 1, 4, 3 N. E. 557; *Pierce* v. *Vansell* (1905), 35 Ind. App. 525, 535, 74 N. E. 554; *Preston* v. *Bowmar* (1821), 6 Wheat. *582, 5 L. Ed. 336; *Brown* v. *Huger* (1859), 21 How. 305, 318, 16 L. Ed. 125, 129; *Higuera* v. *United States* (1865), 5 Wall. 827, 835, 18 L. Ed. 469, 471; *St. Clair County* v. *Lovingston* (1874), 23 Wall. 46, 62, 23 L. Ed. 59, 61; *Security Land, etc., Co.* v. *Burns, supra,* and cases cited. Generally speaking, "meander lines are run in surveying fractional 8. portions of the public lands bordering on navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser. * * * Proprietors bordering on streams not navigable, unless re-

stricted by the terms of their grant, hold to the center of the stream." *Sizor* v. *City of Logansport* (1898), 151 Ind. 626, 627, 628, 50 N. E. 377, 44 L. R. A. 814, and cases cited. See, also, *Tolleston Club* v. *State, supra; Tolleston Club* v. *Clough, supra; Kean* v. *Roby, supra; Mason* v. *Calumet Canal, etc., Co., supra; Gary Land Co.* v. *Griesel, supra; Brophy* v. *Richeson, supra; Stoner* v. *Rice, supra; Sphung* v. *Moore* (1889), 120 Ind. 352, 22 N. E. 319; *Ross* v. *Faust, supra; Ridgway* v. *Ludlow, supra; Hardin* v. *Jordan, supra; Mitchell* v. *Smale, supra; Whitaker* v. *McBride, supra; St. Paul, etc., R. Co.* v. *Schurmeier* (1869), 7 Wall. 272, 19 L. Ed. 74. "The second section of the Act of Congress of 1796 provides that navigable rivers shall not be included in public surveys; but does not indicate what shall be considered such; and it is left to the discretion of the surveyor to include a given river or not. But of course his decision can not be conclusive." *Ross* v. *Faust, supra,* 475. While a meander line may be and frequently is treated as a bounary line yet this is done only when it appears that it was the intent of the parties to the instrument of conveyance, that it should be so treated. *Sizor* v. *City of Logansport, supra;* 4 R. C. L. 97; *Irvin* v. *Crammond, supra; Horne* v. *Smith, supra.*

In the instant case no such intent appears, as between the government and the State. On the contrary, the facts all justify, if they do not compel, the inference that the stream and not the meander line should be treated as the boundary. We say this because it appears from the Act of Congress pursuant to which the patent of the United States government was issued, and to which reference was had in the patent, that

it was the purpose and intent of Congress "*that all the 'swamp and overflowed lands' made unfit thereby for cultivation within the State of Indiana which remained unsold at the passage of said act shall be granted to said State.*" (Our italics.) To carry out this purpose, Congress in said act provided that, as soon after its passage as practicable, it should be the duty of the Secretary of the Interior "to make out an accurate *list and plats of the lands described as aforesaid* and transmit the same to the governor of the State * * *. And at the request of said Governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State * * * subject to the disposal of the legislature thereof: *Provided, however,* That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid. * * * That in making out a list and plats of the land aforesaid, *all legal subdivisions,* the greater part of which is 'wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it, shall be excluded therefrom." (Our italics.) 9 Stat. at Large 519, Chap. 83.

To enable the State to select and indicate the swamp lands to be granted to it under such act, the Department of the Interior was by such act authorized to make out plats of such lands to be furnished the State for its selection. Pursuant to this authority, the plat of the government survey was made in 1834 and 1835 and set out in this opinion was adopted by the *general land office of the United States and furnished to the State as being*

*a plat* from which it might indicate and select "*all* the swamp and overflowed lands made unfit for cultivation then unsold within the State. From such plat the State, as shown by its patent from the government, reported its selections to the 'general land office of the United States.' The plat, thus adopted by the government and furnished to the State, from which it made its selections of such lands designated the strip of territory between the meander lines indicated on such plat as 'Kankakee River.' "

Such territory was either swamp land or it was what such plat showed it to be, viz., "Kankakee River." If it was swamp land, it is manifest that under the Act of Congress it was the intention of the government to give it to the State, and it is equally certain that the land surrounding the water (or meandered territory) at least was all surveyed so that the identification of the submerged territory was absolute and the State did all it could to indicate its intention to select and take such territory because it indicated and selected *all* of such surveyed territory, viz., *all* of the abutting fractional sections and subdivisions thereof. On the other hand, if the meander line should in fact be treated as the government plat indicates it should be treated, that is to say, if the Kankakee River should be treated as the boundary of the lands selected by the State, then the State takes the territory within the meander lines under the doctrine of riparian ownership. The selection of land by the State and the issuing of its patent pursuant thereto under the act in question is therefore easily distinguishable from the cases involving a patent from the government to an individual where there was a sale at so much per acre, and the meander line was one of the lines which bounded

and circumscribed the number of acres for which the patent was issued. The instant case has the further advantage over the case of *Hardin* v. *Jordan, supra,* in that the territory between the meander lines is designated as "Kankakee River," while the territory involved in that case was designated as "lake" or "marsh". Such river being nonnavigable, no question can exist as to the application of the doctrine of riparian ownership, while some jurisdictions have refused to apply this doctrine to inland lakes or ponds which have no current. *Trustees of Schools* v. *Schroll* (1887), 120 Ill. 509, 12 N. E. 243, 60 Am. Rep. 575; *Hardin* v. *Jordan, supra; City of St. Louis* v. *Myers* (1885), 113 U. S. 566, 5 Sup. Ct. 640, 28 L. Ed. 1131; *Webber* v. *Pere Marquette Boom Co.* (1886), 62 Mich. 626, 30 N. W. 469; *State* v. *Milk* (1882), 11 Fed. 389; *Wheeler* v. *Spinola* (1873), 54 N. Y. 377, 385; *State* v. *Portsmouth Sav. Bank, supra.* The instant case has the further fact in its favor that, so far as the evidence shows, the United States has never issued any patent to the land involved, other than that issued to the State and has never made any additional survey of such territory or made any claim thereto. Congress, by the act in question, having authorized the giving of *all* said land, and the officers of the government, under the authority of such act, having furnished to the State a plat which was treated both by the United States and the State as being sufficient for its selection of *all* of such lands, and which is open to an interpretation that will make it sufficient for such purpose, it is the duty of the court to adopt such interpretation. Such considerations doubtless had their influence in the decision of *Hardin* v. *Jordan, supra,* and the cases following that decision. The language of

the Supreme Court of the United States in the case of *Kean* v. *Calumet Canal, etc., Co.*, above quoted, is specially applicable to the facts of this case. For the reasons indicated and on the authorities, *supra*, we hold that title to the land in question passed from the United States government to the State of Indiana.

We next inquire whether the State has parted with its title to this land. In this connection, it is very earnestly insisted by appellees that a holding that the State acquired title under 11. its patent to the lands in dispute necessitates a holding that it has passed or conferred title to its respective patentees, because it adopted the government survey and plat and in its patents conveyed with reference to such survey and plat, and by the same description that it received title; that the State should not be permitted to say that, when it took the land from the United States government, the meander line of the Kankakee River as designated on the plat of the survey made by such government was in fact the bank or meander line of such river and was not a boundary, and then, when the State sold such land under the same plat and description be heard to say that such meander line was no longer a meander line of the river, but was in fact a boundary line, and limited the lands sold by the State within such boundary. Upon first impression this argument seems conclusive, but, Will it bear analysis? As before indicated, in this opinion, the general rule is that the meander line of a watercourse is not treated as a boundary line but, instead, the watercourse is treated as the boundary. However, in determining 12. whether such meander line should be treated as a natural monument marking the bank

of the stream which it is supposed to meander, or as a boundary line beyond which the grantee may not claim title, the intention of the parties to the instrument should always have an important, if not a controlling influence. Such intention must ordinarily be ascertained from the instrument itself, but, where uncertainty exists from the instrument, resort may be had to other proper methods to ascertain such intent. In other words, if a contract is open to two constructions, or if there be uncertainty or ambiguity in its language, such contract should be interpreted, if possible, in the light of the facts and circumstances which existed and were present and of influence at the time the instrument was prepared and executed, and the intent of the parties, when so ascertained should, if possible be carried out. *Guaranty Sav. etc., Assn.* v. *Rutan* (1893), 6 Ind. App. 83, 33 N. E. 210; *Reissner* v. *Oxley* (1881), 80 Ind. 580; *Chicago, etc., R. Co.* v. *Barnes* (1888), 116 Ind. 126, 17 N. E. 459; *H. G. Olds Wagon Works* v. *Coombs* (1890), 124 Ind. 62, 24 N. E. 589; *Manhattan Oil Co.* v. *Carrell* (1905), 164 Ind. 526, 73 N. E. 1084.

13. The important and influential reason for the existence of the rule which gives a natural monument favor over other calls in a survey is because it is presumed to be the intention of the parties to the grant to convey the lands actually surveyed, and natural monuments when called for are supposed to include and bound the lands so surveyed and the presumption is that such monuments are less likely to be mistaken than are other calls in the survey. *M'Ivers* v. *Walker, supra; Security Land, etc., Co.* v. *Burns, supra; White* v. *Luning* (1876), 93 U. S. 514, 23 L. Ed. 938, 940; *Davis* v. *Rainsford* (1821), 17 Mass. 207;

4. R. C. L. 101, §35. The undisputed facts in this case show that, as between the State and its patentees, said reason does not exist for favoring the natural monument rather than the meander line as the true boundary of the lands granted to the State's patentees. When the reason for a rule ceases, the rule itself ceases.

We have already indicated in this opinion that we thought it was the clear intent of the government to pass and the State to accept all the swamp lands in the State and, to accomplish that purpose, we concluded that, as between the government and the State, it was the duty of the court to treat the watercourse meander line as the true boundary of the lands selected by the State under such Swamp Land Act. We now inquire, What was the intent between the State and its patentees as shown by the patents and by the act of the legislature pursuant to which such patents were issued, reference being made in such patents to the acts of the legislature as the authority under which they were issued?

The act under which the lands in question were sold by the State was the Swamp Land Act of January 27, 1852 (1 R. S. 1852 p. 471), entitled an "Act to *regulate* the sale of swamp lands donated by the United States to the State of Indiana, and to *provide for* the draining and reclaiming thereof in accord with the conditions of said grant." The act constitutes the county auditor and county treasurer as agents to sell such lands and provides that the auditor of state shall cause to be prepared plats of all such lands and forward the same to the respective auditors of the counties; that "each tract of land so offered for sale shall be struck off to the highest bidder therefor, for any sum *not less than one dollar and twenty-five cents for each acre in*

*the tract"; that the auditor shall give to the pur-*
chaser a brief certificate stating the name of the
purchaser, *the tract or tracts purchased by him, the
number of acres contained in such tract or tracts,
and the price per acre* at which the same was sold;
that the certificate holders shall present the cer-
tificate to the treasurer, pay him the whole amount
of the purchase money, and that the treasurer
shall give to the purchaser a duplicate receipt,
"specifying therein the date of the receipt of the
money, the name of the purchaser, *the amount
paid for each acre, the number of acres in the tract
or tracts,* the county, congressional township, range
and section in which the tract or tracts are situ-
ated"; that the county auditor shall enter in a
book, kept by him for that purpose, "a brief de-
scription of each tract of land purchased, *the
number of acres contained therein, the price paid
for each acre,* the name of the purchaser or purchas-
ers, and the date of the purchase"; that the treas-
urer shall forward to the auditor of state a cer-
tified copy of the record of certificates issued by
him to purchasers; that the auditor of state
shall prepare the deeds to the purchaser *upon the
receipt of the returns from the treasurers,* and that
the deeds shall be signed by the governor and at-
tested by the secretary of state; *that the moneys
received shall constitute a special fund to be used in
paying expenses of selecting, platting, and selling
lands, expense of reclaiming the land by ditching or
dyking, and the balance "shall constitute a portion of
and belong to the common school fund of the State* as
in the Constitution provided"; *the unsold lands
were made "subject to entry at the sum of one dollar
and twenty-five cents the acre."*   (Our italics.)

Under this act, there was imposed on the agents
of the State, the duty of surveying and ascer-

taining the number of acres in each tract sold. This was a prerequisite to the sale and the authority of the agents to sell was thereby limited. The whole tenor and theory of the act is that the number of acres to be sold to each purchaser should be ascertained and paid for at the rate of not less than $1.25 an acre, and that when a report of such sale was made the purchaser should receive his deed and the fund so raised should be used to pay the expenses of selecting, *platting* and selling lands and expenses of reclaiming, etc. Can it be said that under such act the agents of the State were authorized to convey to any purchaser more than the ascertained acreage in his lot; or, that such purchaser had any right to suppose that he was getting more than he paid for; or, that the State, would, for example, take the $12.25 paid by P. & B. for the 9.80-acre tract and after paying the proportion of expenses of sale allotted to such tract, apply enough of the balance of the $12.25 towards redeeming 240 acres more for the benefit of P. & B. and then turn the balance into the school fund? In this connection its seems appropriate to ask, What would the school fund get? All of the provisions of this act indicate that it was the intent of the legislature that the lines of survey used or adopted by the State for the purpose of identifying and bounding the tracts sold to the State's patentees should mark and circumscribe the number of acres sold to each purchaser and hence that all of such lines, whatever they may have been shown to be on the plats, so made or adopted for such sale should be treated as boundary lines. The government plat, adopted by the State in making its sales to its patentees shows that the territory between the meander lines, marked "Kankakee River," was not actu-

ally surveyed; that all of the lots bordering on such meander lines were surveyed and that the line bounding such abutting lots including such meander line, enclosed the number of acres indicated as being in such lots. The agents of the State by adopting such survey, in so far as it showed surveyed lots with the boundaries necessary to include and mark the acres indicated in each lot to be sold, would be strictly within the spirit and letter of the authority under which they were acting; but an adoption of the survey with the idea that a watercourse which in no way fixed or determined acreage in any tract sold should mark the true boundary of any such tracts would have been in violation of such authority. Being purely statutory, grants of public lands should be scrutinized and construed by the courts with reference to the statutes and the statutes must be given their true interpretation and force. *Kean* v. *Calumet Canal, etc., Co., supra,* and cases cited; *Security Land, etc., Co.* v. *Burns, supra,* and cases cited; *Tolleston Club* v. *Lindgren* (1907), 39 Ind. App. 448, 451, 452, 77 N. E. 818; *State* v. *Portsmouth Sav. Bank, supra.* In interpreting a patent, all contained in the patent must be considered, and the identity of the land ascertained by a reasonable construction thereof, rejecting if necessary any erroneous call. *Kean* v. *Calumet Canal, etc., Co., supra,* and cases cited. Especially is this true where a survey was not actually run on the ground. *Platt.* v. *Vermillion* (1900), 99 Fed. 356, 39 C. C. A. 555.

In discussing the subject under consideration, the Supreme Court, in the case of *Brophy* v. *Richeson, supra,* said: "If the boundaries were uncertain 'the number of acres, according to the survey' would certainly be an indication as to the location of the true boun-

dary line within which those acres were contained, especially in a case like this, where there is no dispute as to the boundary except as to one side." See also, *Chapman & Dewey Lumber Co.* v. *St. Francis Levee Dist.* (1914), 232 U. S. 186, 197, 34 Sup. Ct. 297, 58 L. Ed. 564, 568, and cases cited.

In the case of *Niles* v. *Cedar Point Club, supra*, 306, the court said: "It may be that surveyor Rice erred in not extending his surveys into this marsh, but his error does not enlarge the title conveyed by the patents to the surveyed fractional sections. The United States sold only the fractional sections, received only pay therefor, an amount fixed by the number of acres conveyed, and one receiving a patent will not ordinarily be heard to insist that by reason of an error on the part of the surveyor more land was bought than was paid for, or than the government was offering for sale."

The authorities which appellees cite and rely on as fixing the river as the boundary rather than the meander line all recognize that the purpose of a meander line is *to ascertain the number of acres in the fractional section subject to sale and for which the government charged a consideration.* Such was the only purpose to be served by the survey required by the act of the legislature in this case. The meander lines, with the other unquestioned lines of the survey indicated on the government plat, accurately and correctly measured the number of acres in each tract sold by the State, and they did not and could not, within the letter and spirit of the act of the legislature, correctly, serve any other purpose.

In the case of the *State* v. *Portsmouth Sav. Bank, supra*, the Supreme Court in discussing the authority of the officers of the State in the matter of

the sale of its swamp lands under the act of the legislature here involved, said: "Public officers have no authority to dispose of the State's lands except such as is conferred upon them by positive statute. Any sales of such lands by them without such statutory authority are void as against the State, unless they are in some proper way ratified by the State. *McCaslin* v. *State, ex rel.* [1885], 99 Ind. 428; *Brown* v. *Ogg* [1882], 85 Ind. 234; *Vail* v. *McKernan* [1863], 21 Ind. 421; *Skelton* v. *Bliss* [1855], 7 Ind. 77; *Ferris* v. *Cravens* [1879], 65 Ind. 262; *Whiteside* v. *United States* [1876], 93 U. S. 247 [23 L. Ed. 882]; *Hull & Argalls* v. *Marshall County* [1861], 12 Iowa 142. * * * The border lands were in a condition to be sold, and the officers had authority to sell them. The bed of the lake was not in a condition to be sold, and hence they had no authority to dispose of it directly or indirectly. Of this lack of authority, Dunn and Condit were bound to take notice. They were bound to take notice of the public records and statutes. Those lands could not have been given away by the officers to the detriment of the school fund, and in violation of the object of the grant. Neither could they be disposed of in any way, except in pursuance of law. The State held the swamp lands in trust for the people, and the object for which they were granted. Its grants of such lands therefore, are to be construed strictly. *Wilcoxon* v. *McGhee* [1851], 12 Ill. 381, 54 Am. Dec. 409; *McManus* v. *Carmichael* [1856], 3 Iowa 1; *City of Terre Haute* v. *Terre Haute Water Works Co.* [1884], 94 Ind. 305. To grant the contention of appellee would be to hold that a grantee from the State of a forty-acre tract of overflowed and swamp land, bordering upon a lake four miles in width, would take by the State's deed, not

only the forty acres, but in addition a strip of land as wide as the forty-acre tract and two miles long. Without entering upon a review of the numerous cases upon the subject of riparian rights, we are very clear that the deeds or patents from the State to Dunn and Condit carried to them no more of the swamp and overflowed lands than were included in the several surveyed subdivisions bounded by the lake.  As fully supporting our conclusions in this case, and upon the general subject of grants of lands bordering upon natural lakes, we cite the following authorities: *State* v. *Milk, supra; Boorman* v. *Sunnuchs* [1877], 42 Wis. 233; *State* v. *Gilmanton* [1839], 9 N. H. 461; *Seaman* v. *Smith* [1860], 24 Ill. 521; *Fletcher* v. *Phelps* [1856], 28 Vt. 257; *Mansur* v. *Blake* [1873], 62 Me. 38; *Wheeler* v. *Spinola, supra;* Angell, Watercourses §41; *Paine* v. *Woods* [1871], 108 Mass. 160; *Diedrich* v. *Northwestern Union R. Co.* [1877], 42 Wis. 248, 24 Am. Rep. 399." To the same effect is the case of *Tolleston Club* v. *Lindgren, supra*

We are aware that in the case of *Gary Land Co.* v. *Griesel, supra,* the Supreme Court, referring to the case last cited, said: "There are doubtless distinctions in the facts between that case and this, *but if it can be said to be in conflict with the rule herein declared it is expressly overruled."* (Our italics.) It must be admitted that the case of *Tolleston Club* v. *Lindgren, supra,* can not be reconciled with some of the more recent cases of the Supreme Court. The same thing, however, may be said of the earlier cases of the Supreme Court. The language quoted from the case of *State* v. *Portsmouth Sav. Bank, supra,* is wholly irreconcilable with the announcements of some of the later cases, yet the former case has never been expressly

overruled, criticised or modified; and it expressly recognizes the limitation of authority imposed on the State's officers in the sale of swamp lands of the State under the act here involved and also expressly states that such officers "were authorized to sell those lands by surveyed legal designated and platted subdivisions and at no less than $1.25 per acre". It is this limitation of authority which furnishes the reason for treating a meander line as a boundary line circumscribing the acres sold to the State's patentees in its swamp land patents. In the case of *Tolleston Club* v. *State, supra,* which seems to be in conflict with *Tolleston Club* v. *Lindgren,* the Supreme Court said: "If the meander line in this case were actually, or *by necessary implication made a boundary of the lands sold it is of course evident that such boundary would stand just as any other boundary named or described."* In view of the provisions of the act of the legislature, above indicated, we are unable to see how such necessary implication can be avoided. It is useless, however, to discuss the decided cases further.

At the time of the sale by the State of the abutting lots, the disputed territory was in fact swamp land or marsh of the same kind and character as that sold by the State, and which the act in question required to be sold and not given away. When the State, in any given case, sold swamp lands or overflowed lands that were bounded by a river, of course, under the law of the State, the purchaser took to the thread of the stream, but when the State sold swamp and overflowed lands, it did not give the purchaser the right to take all swamp and overflowed lands that adjoined the land that he bought. It gave him the right to the

land sold to him and to none other. Land is never appurtenant to land. The doctrine of riparian ownership applies only where the watercourse is in fact the boundary of the lands to which the doctrine is sought to be applied, and where there is uncertainty as to whether the meander line or the watercourse was intended as the boundary in determining such question reference must be had to the conveyance to the party claiming the application of such doctrine and to the time of such conveyance, and not to a remote time of conveyance. *Ocean City Assn.* v. *Schriver* (1900), 64 N. J. L. 550, 559, 46 Atl. 690, 51 L. R. A. 425; *Johnston* v. *Jones* (1862), 1 Black 209, 221, 17 L. Ed. 117; *James* v. *Howe* (1885), 41 Ohio St. 696, 709.

It follows from what we have said that the decision of the trial court is not sustained by sufficient evidence, and the judgment below is therefore reversed with instructions to the trial court to grant a new trial and to take such other steps in the case as may be consistent with this opinion.

Shea, C. J., Ibach, P. J., Felt and Moran, JJ., concur. Caldwell, J., not participating.

## On Petition for Rehearing.

Hottel, J.—In their petition for rehearing appellees say that the court has repeatedly stated in its original opinion in this case that the official plat with reference to which all the conveyances were made shows the marginal lots to abut upon the *meander line* of the Kankakee River. They insist that this is an erroneous statement; that the *meander line* of the Kankakee River "is not shown upon the original government plat." This is a departure from the position taken by appellees in

their original brief.    In such briefs in their state-
ment of the "nature of the action", appellees desig-
nate the lands in controversy as "lands . * * *
situated between the *government meander lines of
the Kankakee River."*    In their statement of the
evidence they say:   "In reference to the meander
lines the field notes describe them as 'meanders of
Kankakee River commencing at post on west
boundary, thence up stream on left bank", etc.
Many other references in their original brief are
to the same effect.   Upon this subject, the posi-
tion originally taken by appellees and adopted by
this court was in accord with the uncontradicted
evidence in the case.   Such plat when interpreted
in connection with the government field notes which
appellees introduced in evidence and which were
proper for no other purpose except to aid in arriv-
ing at a correct interpretation of the plat, shows
clearly that such boundary, or border line, was in
fact the meander line of such river as meandered
by the government survey.

Our attention is also called to a statement in the
original opinion that "all the patents executed by
the State to marginal lots were pursuant to the act
of the General Assembly of the State of Indiana,
approved May 29, 1852."   We should have ex-
cepted from this statement, patent No. 54 to
Edward Hawkins, for lot number 2 in section
21 and lot number 1 in section 28, both in township
33 north, range 3 west, which patent was issued
under an act approved March 7, 1883, entitled
"An act authorizing the sale and conveyance of
certain lands belonging to the State," etc.   The
exception of this patent from such general state-
ment in the original opinion could have had no con-
trolling influence on the conclusion reached which
necessitated the reversal of the judgment, and for

the purposes of the real question therein considered and involved in this appeal, the effect of patent No. 54 is not of controlling importance and hence will not now receive further consideration.

Appellees claim, in effect, that according to the original opinion the riparian doctrine was applied to the State's patent from the United States on the theory that the meandered territory was a river in 1853 and such doctrine held inapplicable to the patents issued by the State because such territory had ceased to be a river in 1857; that it is begging the question to say that the meandered territory was a river in 1353 and ceased to be such four years later. We do not think the original opinion subject to the interpretation which appellees thus seek to place on it. It is true that both the question whether the State received title from the United States government to the lands in controversy, and the question whether it parted with title to the same lands is made to depend on whether the meander lines of the Kankakee River, as indicated on the government plat adopted by both the United States and the State in conveying said lands, should be treated as a boundary line limiting the lands surveyed and intended to be conveyed, or whether such meander line should be treated as marking the sinuosities of the banks of the meandered stream, and the stream itself, the natural monument, be treated as fixing the boundary of the lands conveyed. This court concluded that, as between the United States and the State such meander lines should be treated as marking the sinuosities of the Kankakee River, and that the natural monument, the river, should be treated as the boundary, and hence the State took title to the lands in question under the doc-

trine of riparian ownership, but that as between the State and its grantees or patentees, such meander line should be treated as a boundary line marking and limiting the acres sold.

It is very earnestly insisted by appellees that in holding that such lands were not included in the patents issued by the State the court "lost sight of one controlling fact, or circumstance, and that is, *the significance* of the official plat." Upon this subject they say: "Under the law plats were required to be filed with the county auditor and undoubtedly for the purpose of public information and they likewise became the basis of all sales and were equivalent to a declaration by the State as to the character and boundaries of the lands to be sold." We entirely agree with this contention. Such plats, however, were no more a part of the public record than was the law which required them to be filed with the county auditor, and such plats, in so far as they were a declaration of the State, were made such by the law and they should therefore be read and construed in the light of that law. The difference between the intent expressed in, and the authority given, by the Act of Congress and the intent expressed and authority given by the act of the legislature furnishes the ground upon which the court based its conclusion that such line should be treated as a meander line of the river in the first instance, and a boundary line limiting the acres sold in the second instance.

When such plat referred to in the State's patents is interpreted in the light of the act of the legislature authorizing its use, the meander line on such plat must necessarily be construed as a boundary line, marking and defining acres. The State's officers or agents authorized to make such sales were required to make or adopt a survey that

measured the acres in each tract sold. The government plat did this, but it did it and could do it only on the theory that such meander line was a boundary line. By treating such line as a boundary line marking and limiting the acres in each tract to be sold, the agents of the State could and did ascertain the number of acres in the respective tracts sold, and in so doing acted in strict compliance with the law authorizing such sales, which was the only authority that gave them any power to act in such matter. If said meander line is not treated as a boundary line then the State's officers or agents never either made or adopted any survey which marked and limited the number of acres in the respective tracts sold by them, and hence violated the authority under which they acted.

The officers, authorized to act for the State in such matter, were as effectively bound and limited in their authority by the act of the legislature as an agent of an individual would be in acting under the same express authority in writing; and those who purchased through the agents of the State were charged with knowledge of the authority under which such agents acted, and the scope and extent thereof the same as they would have been had they purchased from an agent of an individual with full knowledge of the authority under which he acted. This principle is in effect recognized and expressed in the case of *State* v. *Portsmouth Sav. Bank* (1886), 106 Ind. 435, 459, 7 N. E. 379, and is the principle on which the court, in its original opinion bases its interpretation of the patents issued by the State. This principle as indicated in the original opinion, has been recognized and approved by the later cases and finds repeated recognition by the courts of

other jurisdictions, including the Supreme Court of the United States.

The patents themselves and all of the written evidence in connection therewith in this case show that both the agents of the State, intrusted with such sales, and the respective patentees or purchasers of said lands treated the government plat as indicating and marking the number of acres in the respective lots sold by the State, and hence necessarily treated said meander line as one of the boundary lines of their respective tracts. It follows that in interpreting said plat, made a part of the patents issued by the State, the court has adopted that interpretation made necessary by the law which authorize both the patents and the plat, and in so doing has likewise adopted the interpretation placed on such patent by the parties themselves at the time the sales were consummated, as shown by all the written evidence and memoranda filed in connection with such sales and the issuing of the patents thereunder.

Finally it is contended by appellees that the opinion is in conflict with a number of decisions of the Supreme Court and has the effect of overruling such cases, and hence that this court has exceeded its authority; that if the opinion correctly interprets the views of the court the case should have been certified to the Supreme Court under §1394 Burns 1914, Acts 1901 p. 565. It is true that the original opinion recognizes that as to some of the questions involved there is apparent conflict in the decided cases, not only in this State but in other jurisdictions as well. The opinion, however, follows the later decisions of the Supreme Court of this State in holding that the State took title to the land in

controversy, and in holding that the State never parted with its title, the opinion, as before stated, is based on a principle that has been given recognition and expression in both the earlier and later decisions of the Supreme Court and by courts of other jurisdictions, as well, including the United States Supreme Court. Under such circumstances we felt at liberty to follow those cases which seemed to us to be supported by the better reason and authority, knowing that if our decision contravenes any ruling precedent of the Supreme Court a method is provided by which appellees may obtain a consideration and determination of their case by such court.

Petition for rehearing overruled.

NOTE.—Reported in 109 N. E. 530, 111 N. E. 342. As to rights of riparian owners, see 79 Ann. Dec. 639; 7 Am. Rep. 179. As to the power of counties to sell real estate as affected by swamp land act, see Ann. Cas. 1913 E. 530. See, also, under (1) 32 Cyc 1369; (2) 32 Cyc 1026; (3) 32 Cyc 903, 904; (4) 5 Cyc 892, 897, 899; (5) 32 Cyc 906; (6) 32 Cyc 905, 907, 909; (7) 5 Cyc 916; (8) 5 Cyc 899; 32 Cyc 804; (9) 32 Cyc 801-803; (10) 32 Cyc 904-906; (11) 32 Cyc 925, 927; (14) 32 Cyc 1033; (15) 5 Cyc 899, 900; (16) 32 Cyc 914; (17) 11 Cyc 745.